ZAGER, Justice.
*185 Keyon Harrison appeals his conviction for first-degree murder. Harrison argues applying the felony-murder rule to juvenile offenders based upon a theory of aiding and abetting violates the Iowa and United States Constitutions. Harrison also presents as-applied and categorical constitutional challenges to his sentence claiming a sentence of life with the possibility of parole for a juvenile offender who was convicted of felony murder constitutes cruel and unusual punishment under the Iowa and United States Constitutions. Further, Harrison maintains the trial court failed to provide the jury with proper instructions regarding the types of assault required to establish the forcible felony robbery element of felony murder. Finally, Harrison presents ineffective-assistance-of-counsel claims alleging he was prejudiced by the errors of his trial counsel, including trial counsel's failure to request certain jury instructions and failure to object to certain evidence presented at trial. For the reasons set forth below, we affirm the conviction and sentence.
I. Background Facts and Proceedings.
On November 7, 2014, starting at approximately 3:45 p.m., Aaron McHenry began receiving calls and text messages from Keith Collins who was looking to buy marijuana from McHenry. Collins, then seventeen years old, and Keyon Harrison, then sixteen years old, were at an Oasis store at the time, and they initially wanted to meet McHenry at the Oasis store. However, McHenry did not know where the Oasis store was located. Therefore, McHenry arranged for them to meet at the Family Dollar store near the 2600 block of Hickman Lane around 4:20 p.m. The purpose of the meeting was to complete the sale of marijuana from McHenry to Collins and Harrison.
At 4:23 p.m., Shirley Dick was taking her dogs outside when she saw a black male, later identified as Collins, walking near her home at 2600 Hickman Lane. Dick approached Collins to see if there was anything she could help him with, and Collins told her that he was waiting for his girlfriend. Dick told Collins there were no kids that lived on her street, and Collins turned away without responding to her. Thereafter, Dick noticed Jorge Gutierrez, a nearby neighbor, chasing his dog as it ran from his house in the direction of Dick's house. Dick waited outside, offering to help Gutierrez retrieve his dog.
While Gutierrez was retrieving his dog and returning home, he observed Collins sitting on a retaining wall on Hickman Lane. Gutierrez also saw McHenry and Harrison walking from 26th Street in the direction of Hickman Lane. Gutierrez saw McHenry and Harrison begin to walk faster, and they eventually "started to, like, push each other." Nevertheless, Gutierrez went back inside, and Shirley Dick turned to walk back towards her home.
*186 As she turned around, Dick heard gunshots, and she saw Collins take off running underneath nearby bushes. Dick testified that Collins was "maybe five feet" from McHenry when she turned around, but she did not see Harrison or anyone else in the area.[1] Dick then called 911. Gutierrez also heard the gunshots and turned around to see McHenry lying on the ground. Gutierrez saw Collins and Harrison start running together "away from Hickman Road."
Several other neighbors told police they saw two black males running away from the area, and two nearby homeowners provided police with security camera footage from their homes showing a black male running away from the area. Camera footage at Broadlawns Hospital, taken shortly after the shooting, shows Collins and Harrison together at the hospital where Collins was treated for an injury to his right hand. Harrison and Collins then went to meet up with Harrison's girlfriend at her residence. The girlfriend testified that when she joined them, she saw Harrison "was holding two bags of marijuana in his hands, like baseball size". Thereafter, the group went to a store to buy blunt wraps for smoking marijuana, and Harrison and Collins smoked some of the marijuana when they returned to the girlfriend's house. Harrison and Collins then returned to Collins's apartment around 8:00 p.m.
When police responded to the 911 call about a shooting at Hickman Lane, they discovered Aaron McHenry's dead body. McHenry had multiple gunshot wounds to the head, torso, upper back, and arm, including a couple of wounds that contained signs indicating he was shot from close range. Police were able to identify Collins as a suspect soon after the shooting. Police contacted the Hoover High School resource officer after another Hickman Lane neighbor told them that one of the individuals went to Hoover High School with her. She also told police that people at the school thought he resembled the rapper Bobby Shmurda. The resource officer identified two individuals who fit that description. Later, the police provided the neighbor with two separate photo arrays. The neighbor was able to positively identify Collins as one of the individuals running from the area of the shooting. Police subsequently obtained a search warrant for Collins's apartment, which they executed about twelve hours after responding to the scene of the shooting.
Harrison was with Collins at the apartment when the police executed the search warrant. Collins had marijuana in his backpack, and Harrison had marijuana on his person. Both packages of marijuana confiscated from Collins and Harrison were identical in amount and packaging. Police recovered the cell phone used to communicate with McHenry, but they did not recover a gun during the search. The police then took Harrison into custody. After Harrison's mother arrived, Detective Youngblut provided Harrison and his mother with his Miranda rights, and they agreed to sign a written waiver of his Miranda rights.
Youngblut conducted Harrison's questioning and recorded the entire interview and events surrounding the interview at the police station. The recording equipment was visible, and there was a sign outside of the interview room informing people that the room was audio and video *187 recorded. Harrison's mother was aware of the recording. While police were not in the room, she informed Harrison that the room was being recorded. During the interview, Harrison was repeatedly dishonest with Youngblut. Harrison told Youngblut that Collins did not have a cell phone. Harrison told Youngblut that he was not with Collins around the time of the murder because he was somewhere else and that he went to Broadlawns Hospital with his girlfriend from his girlfriend's house to meet up with Collins.
When Youngblut left the room, Harrison's mother accused Harrison of lying and told Harrison, "I can't help you if you lyin' to me." In response, Harrison stated,
Alright mama. Look, look. We was walking, [Collins]'s like, "I got a lick." I'm like, "Bro, no, bro, you're not going to do it." He's like, "Bro, I've got a lick. I need it. I need to go to Chicago." He's like-because he's trying to go to Chicago or whatever with his mom. He's like, "Bro, I need it." So I'm like, "Bro, you can hit that lick but bro, I'm just going to stay on the side." So we walking down, we walking down the street and then he was....
Harrison's mother then interjected to remind Harrison that they were being recorded before Harrison could finish the rest of the sentence. A "lick" is slang for a robbery, and the cell phone the police recovered from Collins listed McHenry's phone number under the name "Lick." Investigators found marijuana residue in McHenry's pants pocket but no marijuana, which they believed indicated someone had stolen marijuana from him.
The State charged both Harrison and Collins with first-degree murder. They were tried separately. The State initially charged Harrison with first-degree murder in violation of Iowa Code sections 707.1 and 707.2 and first-degree robbery in violation of Iowa Code sections 711.1 and 711.2 (2015). Harrison's trial began on October 3, 2016. On October 4, before the presentation of any evidence, the State filed an amended trial information that dropped the charge of first-degree robbery.
The State conceded during trial that "the evidence tends to suggest that it was probably [Harrison's] friend and companion Keith Collins" who shot McHenry, and it dismissed the charge of premeditated murder in the first-degree under Iowa Code section 707.2(1)(a ). At trial, the State only presented the theory of first-degree murder based upon the felony-murder rule under Iowa Code section 707.2(1)(b ). The State argued Harrison was guilty of aiding and abetting in the robbery and murder of McHenry. At the conclusion of the trial, the jury returned a unanimous verdict finding Harrison guilty of first-degree murder in violation of Iowa Code sections 707.1 and 707.2(1)(b ) for killing McHenry while participating in a forcible felony, the robbery. Harrison was sentenced to life in prison with immediate parole eligibility. Harrison filed a timely appeal, which we retained.
II. Standard of Review.
We review alleged violations of state or federal constitutional rights de novo. State v. Coleman , 907 N.W.2d 124, 134 (Iowa 2018). In doing so, we evaluate each case "in light of its unique circumstances" by examining the "totality of the circumstances as shown by the entire record" to "make an independent evaluation." State v. Krogmann , 804 N.W.2d 518, 522-23 (Iowa 2011) (quoting State v. Brooks , 760 N.W.2d 197, 204 (Iowa 2009) ). Further, "[w]e may review a challenge that a sentence is illegal at any time." State v. Zarate , 908 N.W.2d 831, 840 (Iowa 2018). Though we typically review challenges to *188 illegal sentences for correction of legal errors, our standard of review for an allegation of an unconstitutional sentence is de novo. Id.
Our standard of review for challenges to jury instructions is for correction of errors at law. Alcala v. Marriott Int'l, Inc. , 880 N.W.2d 699, 707 (Iowa 2016). "We do not consider an erroneous jury instruction in isolation, but look at the jury instructions as a whole." State v. Murray , 796 N.W.2d 907, 908 (Iowa 2011). Our standard of review for claims of ineffective assistance of counsel is de novo. State v. Schlitter , 881 N.W.2d 380, 388 (Iowa 2016). "Ineffective-assistance-of-counsel claims require a showing by a preponderance of the evidence both that counsel failed an essential duty and that the failure resulted in prejudice." Id.
III. Analysis.
Harrison presents a number of claims on appeal. First, he maintains the felony-murder rule violates the Due Process Clause of both the Iowa and United States Constitutions when it is applied to juvenile offenders pursuant to a theory of aiding and abetting. Second, Harrison argues a sentence of life with the possibility of immediate parole eligibility for a juvenile offender convicted of first-degree murder under the felony-murder rule is unconstitutional both as applied to him and on its face under the Cruel and Unusual Punishment Clauses of the Iowa and United States Constitutions. Third, Harrison claims the trial court did not provide proper jury instructions on the specific types of assault necessary to establish a felonious robbery. Finally, Harrison advances ineffective-assistance-of-counsel claims alleging his trial counsel breached essential duties that resulted in prejudice by failing to request certain jury instructions and failing to object to certain evidence presented at trial. We address these claims in turn.
A. The State and Federal Juvenile Sentencing Landscape. Article I, section 17 of the Iowa Constitution and the Eighth Amendment of the United States Constitution provide Iowans convicted of a crime with the right to be free from cruel and unusual punishment. U.S. Const. amend. VIII ; Iowa Const. art. I, § 17. This fundamental constitutional tenet "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned' to both the offender and the offense." Miller v. Alabama , 567 U.S. 460, 469, 132 S.Ct. 2455, 2463, 183 L.Ed.2d 407 (2012) (quoting Roper v. Simmons , 543 U.S. 551, 560, 125 S.Ct. 1183, 1190, 161 L.Ed.2d 1 (2005) ); State v. Propps , 897 N.W.2d 91, 98 (Iowa 2017). In 2005, the United States Supreme Court decided the first in a trilogy of cases interpreting the Cruel and Unusual Punishment Clause under the Eighth Amendment in relation to juvenile sentencing, which has transformed the juvenile sentencing landscape. See generally Miller , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 ; Graham v. Florida , 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) ; Roper , 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1. An overview of these changes is necessary to provide background for our analysis of Harrison's constitutional challenge to the felony-murder rule and his sentence of life imprisonment with immediate parole eligibility.
First, in Roper , the Supreme Court held that imposing capital punishment on juvenile offenders constitutes cruel and unusual punishment under the Eighth Amendment. 543 U.S. at 568, 125 S. Ct. at 1194. In doing so, the Court emphasized the differences between adult and juvenile offenders that "render suspect any conclusion that a juvenile falls among the worst offenders"-namely, the differences in maturity, *189 sense of responsibility, vulnerability to peer pressure and negative influences, and the development of personality traits. Id. at 569-70, 125 S.Ct. at 1195. Second, in Graham , the Supreme Court held that sentencing juvenile offenders convicted of nonhomicide offenses to life imprisonment without the possibility of parole constitutes cruel and unusual punishment under the Eighth Amendment. 560 U.S. at 74, 130 S.Ct. at 2030.
Finally, in Miller , the Supreme Court prohibited all mandatory sentences of life imprisonment without the possibility of parole for juvenile offenders under the Eighth Amendment. 567 U.S. at 479, 132 S.Ct. at 2469. The Court stated, "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features-among them, immaturity, impetuosity, and failure to appreciate risks and consequences." Id. at 477, 132 S.Ct. at 2468. Nevertheless, the Court did not prohibit all sentences of life imprisonment without the possibility of parole. Id. at 480, 132 S.Ct. at 2469. Instead, the Court held that sentencing courts must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison" before issuing a sentence of life imprisonment without the possibility of parole to a juvenile offender. Id.
Following Miller , the Iowa Governor commuted the sentences of all thirty-eight juvenile offenders serving statutorily mandated sentences of life without parole to sentences of life without parole eligibility for sixty years with no credit for earned time. See State v. Ragland , 836 N.W.2d 107, 110-11 (Iowa 2013). Shortly thereafter, we held that Miller applied retroactively, and the Governor's commutations to life without parole for sixty years with no credit for earned time, amounted to de facto sentences of life without the possibility of parole and mandated the individualized sentencing process outlined in Miller . Id. at 117, 122. The Roper - Graham - Miller trilogy, and our holding in Ragland, set the course for drastic changes to juvenile sentencing under the Iowa Constitution.
First, in State v. Null , we held that sentencing a juvenile offender to 52.5 years imprisonment triggered Miller 's individualized sentencing requirement noting "[t]he prospect of geriatric release, if one is to be afforded the opportunity for release at all, does not provide a 'meaningful opportunity' to demonstrate the 'maturity and rehabilitation' required to obtain release and reenter society." 836 N.W.2d 41, 71 (2013) (quoting Graham , 560 U.S. at 75, 130 S.Ct. at 2030 ). In State v. Pearson , we similarly held that the individualized sentencing requirement set forth in Miller applied under the Iowa Constitution to a juvenile offender's sentence of consecutive terms totaling thirty-five years imprisonment without parole eligibility for nonhomicide offenses. 836 N.W.2d 88, 96 (Iowa 2013).
In State v. Lyle , we held that "the sentencing of juveniles according to statutorily required mandatory minimums does not adequately serve the legitimate penological objectives in light of the child's categorically diminished culpability." 854 N.W.2d 378, 398 (Iowa 2014). As a result, we held that article I, section 17 of the Iowa Constitution prohibits all mandatory minimum prison sentences for juvenile offenders. Id. at 400. Additionally, we established the following necessary factors for a district court to consider in deciding whether a juvenile offender warrants the minimum period of incarceration without parole:
(1) the age of the offender and the features of youthful behavior, such as "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the *190 particular "family and home environment" that surround the youth; (3) the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime; (4) the challenges for youthful offenders in navigating through the criminal process; and (5) the possibility of rehabilitation and the capacity for change.
Id. at 404 n.10 (quoting Miller , 567 U.S. at 477, 132 S.Ct. at 2468 ).
In State v. Louisell , we vacated a sentence for a determinate term of years in prison, holding that sentencing juvenile offenders convicted of first-degree murder to a fixed term of years was not an option "[b]ecause there was no statutory authority for the determinate sentence" and "judges may only impose punishment authorized by the legislature within constitutional constraints." 865 N.W.2d 590, 598 (Iowa 2015). We also rejected the defendant's argument on ripeness grounds that she would be denied a meaningful opportunity for release were she to become parole eligible given the low rates at which the state parole board had actually granted parole to eligible offenders. Id. at 601-02. Nevertheless, we reiterated that "juveniles convicted of crimes must be afforded a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation'-if a sentencing judge, exercising discretion, determines parole should be available." Id. at 602 (quoting Graham , 560 U.S. at 75, 130 S.Ct. at 2030 ).
Further, in State v. Seats , we expounded upon the sentencing factors espoused in Lyle and Miller that a sentencing court must consider "before sentencing a juvenile to life in prison without the possibility of parole." 865 N.W.2d 545, 555-57 (Iowa 2015). In applying these factors, we first established that "the presumption for any sentencing judge is that the judge should sentence juveniles to life in prison with the possibility of parole for murder unless the other factors require a different sentence." Id. at 555. Additionally, we explained that the sentencing factors require sentencing courts to acknowledge the differences between children and adults and consider the offender's "family and home environment," "the circumstances of the homicide offense," any substance abuse that may have played a role in the juvenile's offense, and that juveniles have a greater capacity for rehabilitation than adults do. Id. at 555-56 (quoting Miller , 567 U.S. at 477, 132 S.Ct. at 2468 ).
In State v. Sweet , we adopted "a categorical rule that juvenile offenders may not be sentenced to life without the possibility of parole under article I, section 17 of the Iowa Constitution." 879 N.W.2d 811, 839 (Iowa 2016). Underlying this holding was our finding that a sentence of life without the possibility of parole required the sentencing judge to "do the impossible, namely, to determine whether the offender is 'irretrievably corrupt' at a time when even trained professionals with years of clinical experience would not attempt to make such a determination." Id. at 837. We concluded that the parole board is in the best position to determine whether the offender is invariably corrupt. Id. at 839.
In Propps , we upheld a juvenile offender's indeterminate sentence with no mandatory minimum and immediate parole eligibility because it gave the juvenile the "potential for immediate parole if rehabilitation, maturity, and reform have been demonstrated." 897 N.W.2d 91, 101 (Iowa 2017). Moreover, in State v. Roby , we further developed the sentencing factors first set forth in Lyle , explaining that these factors should generally mitigate the punishment of a juvenile offender so that sentencing courts can devise a "punishment that serves the best interests of the child *191 and of society." 897 N.W.2d 127, 144 (Iowa 2017) (quoting Lyle , 854 N.W.2d at 402 ). We also declined to categorically prohibit imposing a minimum term of incarceration without immediate parole eligibility on juvenile offenders convicted of first-degree murder as long as such sentences were only imposed after the sentencing judge considered the necessary mitigating factors associated with youth. Id. at 148. Finally, in Zarate , we held that article I, section 17 of the Iowa Constitution did not categorically prohibit sentencing juveniles convicted of first-degree murder to "life with the possibility of parole after serving a minimum term of confinement as determined by the court," or life with the possibility of immediate parole. 908 N.W.2d at 843, 856 (quoting Iowa Code § 902.1(2)(a )(2) ).
B. Applying the Felony-Murder Rule to Juvenile Offenders. Harrison argues applying the felony-murder rule to juvenile offenders when their liability is grounded on a theory of aiding and abetting violates due process under the Iowa and United States Constitutions. Specifically, Harrison alleges the felony-murder rule is premised on the assumption that juvenile offenders who participate in a forcible felony can appreciate the potential consequences of their participation even though juvenile offenders are "not developed enough to appreciate not only the assumption, but the natural consequence of the [forcible felony] (i.e. the murder)." Harrison relies primarily on our state and federal juvenile sentencing jurisprudence which recognizes that there is a "fundamental and virtually inexorable difference between juveniles and adults for the purposes of punishment." Lyle , 854 N.W.2d at 393. Further, Harrison reasons, even if he did understand the potential consequences of his participation in the robbery, science on juvenile development indicates that he was incapable of controlling his impulses with regard to his participation in the murder.[2]
Iowa Code section 707.2(1)(b ) states, "A person commits murder in the first degree when the person commits murder under any of the following circumstances.... The person kills another person while participating in a forcible felony." Iowa Code § 707.2(1)(b ) (2015).[3] This definition of first-degree murder is known as the felony-murder rule, and it "began as a common-law doctrine of criminal law that any death resulting from the commission or attempted commission of a felony constitutes murder." State v. Tribble , 790 N.W.2d 121, 124 (Iowa 2010). "Felonies that have historically been used to support application of the felony-murder doctrine are those that are particularly serious or inherently dangerous." Id. In Iowa, the legislature has specified which felonies are classified as a "forcible felony" under the felony-murder rule in section 702.11(1). A forcible felony includes "any felonious child endangerment, assault, murder, sexual abuse, kidnapping, robbery, human trafficking, arson in the first degree, or burglary in the first degree." Iowa Code § 702.11(1).
The felony-murder rule aims to deter people from committing those felonies the legislature has deemed inherently dangerous to the life of others. See Tribble , 790 N.W.2d at 127. To promote deterrence, the rule transforms those felonies *192 "into first-degree murder if a person is killed in the course of the felony, even though the felon had no specific intent or premeditation otherwise necessary to elevate the killing of another into first-degree murder." Id. at 127-28. Consequently,
[w]hen a person engages in conduct dangerous enough to be identified by our legislature as a predicate felony for felony murder, the elements of the felony-murder statute are satisfied if the person also engages in an act causing death while participating in the dangerous conduct.
Id. at 126. "In other words, our legislature adopted felony murder to deter the commission of felonies, but not by totally eliminating the relationship between criminal intent and criminal liability." Id. at 128.
In contrast to first-degree murder under section 707.2(1)(a ), which requires a showing that the defendant "willfully, deliberately, and with premeditation kills another person," first-degree murder under the felony-murder rule only requires a showing that the defendant acted with the specific intent to commit the predicate felony that led to the killing. Compare Iowa Code § 707.2(1)(a ), with id. § 707.2(1)(b ). This difference between the intent required for premeditated murder and felony murder has produced confusion and a lack of conformity in the way our court and other courts have explained the felony-murder rule in the past. For example, Harrison notes that our court previously stated in State v. Heemstra , that the elements of premeditated murder under section 707.2(1) -namely that the murder was committed "willfully, deliberately, and with premeditation"-"are presumed to exist if the State proves participation in the underlying forcible felony" for a charge of felony murder. 721 N.W.2d 549, 554 (Iowa 2006) (quoting Iowa Code § 707.2(1) (2001)). Harrison capitalizes on this language in his argument that the felony-murder rule creates a conclusive presumption that the defendant committed the killing with malice aforethought in violation of the Due Process Clauses of the Iowa and United States Constitutions.
The Fifth and Fourteenth Amendments of the United States Constitution, and Article I, section 9 of the Iowa Constitution, prohibit the state from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV ; Iowa Const. art. I, § 9. " 'Due process requires fundamental fairness in a judicial proceeding,' so a trial that is fundamentally unfair violates the guarantees of due process in the United States and Iowa Constitutions." More v. State , 880 N.W.2d 487, 499 (Iowa 2016) (quoting State v. Becker , 818 N.W.2d 135, 148 (Iowa 2012), overruled on other grounds by Alcala , 880 N.W.2d at 708 & n.3 ). "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship , 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). We have recognized that "a mandatory presumption violates the due process clause because it undermines the fact finder's responsibility to find the ultimate facts beyond a reasonable doubt." State v. Winders , 359 N.W.2d 417, 419 (Iowa 1984). "[T]his presumption would conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime." Sandstrom v. Montana , 442 U.S. 510, 522, 99 S.Ct. 2450, 2458, 61 L.Ed.2d 39 (1979) (emphasis omitted) (quoting Morissette v. United States , 342 U.S. 246, 275, 72 S.Ct. 240, 256, 96 L.Ed. 288 (1952) ).
We have previously addressed a due process challenge like the one Harrison *193 now makes regarding the alleged presumptions incorporated in the felony-murder rule, as well as application of the felony-murder rule to defendants who were convicted of felony-murder for aiding and abetting a felony. See generally Conner v. State , 362 N.W.2d 449 (Iowa 1985). Similar to this case, the defendant in Conner claimed "that conclusively attributing malice aforethought to him in relation to the killing, merely from his participation in the underlying felony," violated his right to due process under the Fourteenth Amendment of the United States Constitution. Id. at 455. Like Harrison, the defendant argued that the felony-murder rule creates an unconstitutional presumption that takes the burden off the state to prove the requisite culpability for murder. Id. at 456. We rejected this argument, holding it was "misplaced" because "[a]ccomplice liability ... is a matter of substantive law that places responsibility on a wrongdoer for the direct and indirect consequences of his joint criminal conduct with another." Id. ; see also State v. Nowlin , 244 N.W.2d 596, 604-05 (Iowa 1976) ("The felony-murder statute does not relieve the State of the burden of proving essential elements of first-degree murder. The elements [of willfulness, deliberation, and premeditation] alleged by defendant to be essential are not essential [to felony murder]."). Finally, we exclaimed, "The State, through the enactment of laws, has a right to prescribe the nature of the acts that constitute criminal conduct." Conner , 362 N.W.2d at 456.
Despite our rejection of Harrison's argument in Conner , Harrison argues Conner is not controlling because we did not decide Conner under the Iowa Constitution, it did not involve a juvenile offender, and it directly contradicts our recognition in Heemstra of the presumptions inherent to the felony-murder rule. While we acknowledge our court previously stated in Heemstra that the felony-murder rule presumes the defendant committed the killing with malice, we were not speaking to the constitutional issue now raised. See 721 N.W.2d at 554. As such, that language is not controlling in this case.
The felony-murder rule does not create a conclusive presumption that the defendant committed the murder "willfully, deliberately, and with premeditation," because these are not elements of first-degree felony murder in Iowa. Nowlin , 244 N.W.2d at 604-05. The substantive statutory definition of first-degree felony murder in Iowa does not include these elements since the state is only required to show the specific intent to commit the predicate felony rather than show the defendant acted with premeditation and deliberation to commit murder. See Iowa Code § 707.2(1)(b ). This is a substantive rule of law in Iowa and not simply an evidentiary shortcut to find malice or a presumption that malice existed on the part of the defendant. Consequently, whether the defendant acted "willfully, deliberately, and with premeditation" is wholly irrelevant when the defendant is charged with felony murder, regardless of the dicta Harrison cites from Heemstra . "In that event the 'conclusive presumption' is no more than a procedural fiction that masks a substantive reality, to wit, that as a matter of law malice is not an element of felony murder." People v. Dillon , 34 Cal.3d 441, 194 Cal.Rptr. 390, 668 P.2d 697, 717 (1983) (en banc). Therefore, it does not follow that the felony-murder rule violates the Due Process Clauses of the Iowa or United States Constitutions by creating a conclusive and unconstitutional presumption about the defendant's intent to commit murder. Our ruling is supported by a number of other states, which have likewise considered and rejected claims that the felony-murder rule violates due process because it creates an unconstitutional presumption *194 that the defendant committed the killing with malice aforethought.[4]
By asking us to rely on a procedural fiction to hold that the felony-murder rule creates an unconstitutional presumption about the intent of juvenile offenders, Harrison is essentially asking us to implement greater due process rights for juvenile *195 offenders than adult offenders. Harrison is right that we have recognized that "children are constitutionally different from adults," Seats , 865 N.W.2d at 556 (quoting Miller , 567 U.S. at 471, 132 S.Ct. at 2464 ), for sentencing purposes due to "the features of youthful behavior, such as 'immaturity, impetuosity, and failure to appreciate risks and consequences.' " Lyle , 854 N.W.2d at 404 n.10 (quoting Miller , 567 U.S. at 477, 132 S.Ct. at 2468 ). Yet, we have never held or implied that these constitutionally recognized differences require our court or the legislature to transform the elements of any given offense to account for these differences. Harrison seeks to expand the scope of our juvenile sentencing jurisprudence far beyond its rational reach.
"Harm to a victim is not lessened because of the young age of an offender." Propps , 897 N.W.2d at 102. "[W]hile youth is a mitigating factor in sentencing, it is not an excuse." Lyle , 854 N.W.2d at 398 (quoting Null , 836 N.W.2d at 75 ). Consequently, our "constitutional analysis is not about excusing juvenile behavior, but imposing punishment in a way that is consistent with our understanding of humanity today." Propps , 897 N.W.2d at 102 (quoting Lyle , 854 N.W.2d at 398 ). We do this by providing juveniles with an individualized sentencing process that incorporates a number of mitigating factors associated with "the features of youthful behavior." Lyle , 854 N.W.2d at 404 n.10 ; see also Zarate , 908 N.W.2d at 855-56. Nevertheless,
the State has a legitimate interest in holding persons responsible for their criminal acts. When those acts are particularly serious, as in the case of forcible felonies, it is logical that the State would assign grave consequences to them.... "Having placed certain designated crimes committed by juveniles who have reached the age of sixteen within the criminal court jurisdiction, the legislature presumably thought the need for adult discipline and legal restraint was necessary in these cases."
State v. Mann , 602 N.W.2d 785, 792-93 (Iowa 1999) (quoting State v. Terry , 569 N.W.2d 364, 367 (Iowa 1997) ).
Harrison does not provide us with any reason for further intruding upon the role of the legislature to expand our juvenile sentencing jurisprudence to hold that juvenile offenders cannot be tried for certain crimes altogether due to their mens rea requirements. No other state that has considered this issue has abolished the application of the felony-murder rule to juvenile offenders.[5] Moreover, despite the controversy surrounding the felony-murder rule, few states have actually abolished the felony-murder rule, and one of these states has only abrogated the common law felony-murder rule as opposed to a statutory version.[6] Notably, with the exception of *196 Michigan, those states that have abolished the use of the felony-murder rule have done so through statutes enacted by their state legislatures as opposed to judicial abrogation.
Further, Harrison misrepresents the felony-murder rule in his argument that it is premised on the ability to foresee danger. Though the inherent dangerousness of the forcible felonies encompassed within the felony-murder rule may make certain killings foreseeable, the felony-murder rule encompasses unforeseeable crimes. The premise of the rule is that there are certain felonies that "are so inherently dangerous that proof of participating in these crimes may obviate the need for showing all of the elements normally required for first-degree murder." Heemstra , 721 N.W.2d at 554. Robbery, especially armed robbery, requires the use of force and is "so inherently dangerous" that participating in it as the principal or aider and abettor in the manner that Harrison did carries with it an undeniable prospect of grave harm to the life of others. See Conner , 362 N.W.2d at 456.
The fact that killing was not within the actual contemplation and intention of one of the parties to the robbery does not relieve such person of the responsibility as long as the other party to the robbery had the necessary mens rea and the act was a consequence of carrying out the unlawful common design.
Id. at 455. Thus, foreseeability is irrelevant to the felony-murder rule, and Harrison's alleged inability to foresee the consequences of his decision to participate in a robbery is likewise irrelevant to his conviction.
Finally, Harrison's contentions that he could not foresee the consequences of his decision to participate in a robbery, or that he could not control his impulses even if he could foresee the consequences, are irreconcilable with his admitted role in the commission of the robbery. Harrison admitted that he knew Collins was going to commit a "lick" when Harrison knowingly accompanied him to Hickman Lane that day. Harrison then lured McHenry to Collins and used force against him to help Collins carry out the robbery. By participating in robbery-a forcible felony that the Iowa legislature has deemed inherently dangerous to human life-Harrison became liable for any killing committed in the commission of that offense by him or Collins. While there may be a unique factual situation in which the felony-murder rule is unconstitutional as applied to a certain juvenile offender, this is not that case. Therefore, we decline to hold that the felony-murder rule is fundamentally unfair or that it violates due process under the Iowa or United States Constitutions when applied to juvenile offenders pursuant to a theory of aiding and abetting.
C. Sentencing Juveniles Convicted Under the Felony-Murder Rule. Harrison presents both an as-applied and categorical constitutional challenge to his sentence of life imprisonment with immediate parole *197 eligibility. Harrison argues that the sentence of life imprisonment with the possibility of immediate parole for juvenile offenders convicted of first-degree murder as an accomplice to felony murder constitutes cruel and unusual punishment under the Iowa and United States Constitutions. Further, Harrison claims his sentence of life imprisonment with the possibility of immediate parole is "grossly disproportionate to [his] ultimate[ ] culpability" since he "did not personally murder any individual, [and] no evidence was presented that he knew a murder would happen or was likely to happen."
1. Categorical challenge. We analyze categorical challenges to a sentence through a two-step inquiry. Lyle , 854 N.W.2d at 386. We first review " 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue." Id. (quoting Graham , 560 U.S. at 61, 130 S.Ct. at 2022 ). Next, we examine "our controlling precedents and our interpretation of the Iowa Constitution's text, history, meaning, and purpose to guide our own independent judgment on the constitutionality of the challenged sentence." Zarate , 908 N.W.2d at 843. We also assess "the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question," as well as whether the sentencing practice furthers legitimate penological goals. Lyle , 854 N.W.2d at 386 (quoting Graham , 560 U.S. at 67, 130 S.Ct. at 2026 ).
First, there is not a national consensus against sentencing juvenile offenders convicted of felony murder as the principal or accomplice to life imprisonment with immediate parole eligibility, and Harrison acknowledges this. In fact, he "is not aware of any state that has categorically held that life with the possibility of parole should be categorically prohibited for juveniles convicted of felony murder."[7] The *198 national consensus remains in favor of subjecting juvenile offenders convicted of first-degree murder under the felony-murder rule-regardless of whether an offender was aiding and abetting or the principal actor-to the same sentencing options as juvenile offenders convicted of premeditated first-degree murder.[8] *199 In addition to the national consensus in favor of treating felony murder and premeditated murder the same for sentencing purposes, there are objective indicia that the Iowa legislature has adopted this standard regarding the challenged sentencing practice. "Legislative judgments can be 'the most reliable objective indicators of community standards for purposes of determining whether a punishment is cruel and unusual.' " Lyle , 854 N.W.2d at 388 (quoting State v. Bruegger , 773 N.W.2d 862, 873 (Iowa 2009) ). The legislature is aware of the different forms of first-degree murder, yet it has declined to treat them differently for sentencing purposes. This legislative decision to require mandatory life imprisonment with the possibility of immediate parole for juvenile offenders convicted of either premeditated murder or felony murder is indicative of a consensus in Iowa in favor of the challenged sentencing practice.
Despite the fact that there is no national consensus in opposition to the challenged sentencing practice based on the laws of other states, Harrison asks us to consider "that many legal scholars throughout the country have not only routinely held that the felony murder rule is improper, but have specifically argued for the abolishment of the felony murder rule as applied to juveniles." Nevertheless, much of the scholarly criticism-including from some of the legal scholars Harrison cites-of applying the felony-murder rule to juveniles focuses on the sentence of life without parole that many jurisdictions impose on juveniles convicted of felony murder. See, e.g. , Steven A. Drizin & Allison McGowen Keegan, Abolishing the Use of the Felony-Murder Rule When the Defendant Is a Teenager , 28 Nova L. Rev. 507, 536, 541 (2004) (noting "it is debatable as to whether we should ease the prosecution's burden for a crime that can carry the death penalty or life without possibility of parole, and especially debatable when child defendants are involved" and concluding that juveniles "convicted of felony murder should be exempted from the sentence of life without the possibility of parole"); Erin H. Flynn, Comment, Dismantling the Felony-Murder Rule: Juvenile Deterrence and Retribution Post- Roper v. Simmons, 156 U. Pa. L. Rev. 1049, 1068 (2008) ("If convicted of a felony-murder charge, juveniles are often subject to corresponding mandatory sentencing laws that remove a judge's discretion to account for a juvenile offender's individual characteristics and his level of threat to public safety."). We already quashed these concerns surrounding sentencing juveniles convicted of felony murder to life imprisonment without parole in Sweet where we held sentencing juvenile offenders to life imprisonment without the possibility of parole violates the Iowa Constitution. See Sweet , 879 N.W.2d at 839.
While there is not a national consensus against the sentencing practice at issue, this does not end our inquiry into Harrison's categorical challenge to sentencing juvenile offenders convicted of felony murder to life imprisonment with immediate parole eligibility. We still must "consider our controlling precedents and our interpretation *200 of the Iowa Constitution's text, history, meaning, and purpose to guide our own independent judgment on the constitutionality of the challenged sentence." Zarate , 908 N.W.2d at 843. Likewise, we must "evaluate whether the challenged sentencing practice serves legitimate penological goals." Id. This also requires us to examine "the culpability of the offenders at issue in light of their crimes and characteristics along with the severity of the punishment in question." Lyle , 854 N.W.2d at 386 (quoting Graham , 560 U.S. at 67, 130 S.Ct. at 2026 ).
"We seek to interpret our constitution consistent with the object sought to be obtained at the time of adoption as disclosed by the circumstances." Chiodo v. Section 43.24 Panel , 846 N.W.2d 845, 851 (Iowa 2014). Nevertheless, "originalism may not be the best guide for interpreting our constitution's cruel and unusual punishment clause in light of the changes to juvenile sentencing" since "juveniles over the age of fourteen were tried and sentenced as adults when our constitution was adopted." Zarate , 908 N.W.2d at 846. Yet, an analysis of our own juvenile sentencing jurisprudence supports sentencing juvenile offenders convicted of felony murder to life imprisonment with immediate parole eligibility.
Both our juvenile sentencing jurisprudence and that of the United States Supreme Court centers around the "fundamental and virtually inexorable difference between juveniles and adults for the purposes of punishment." Lyle , 854 N.W.2d at 393. Because of this difference, "juveniles convicted of crimes must be afforded a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " Louisell , 865 N.W.2d at 602 (quoting Graham , 560 U.S. at 75, 130 S.Ct. at 2030 ). Nevertheless, Harrison does not argue as part of his categorical challenge that the sentence of life imprisonment with the immediate possibility of parole for juvenile offenders convicted of felony murder denies these offenders "a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' "[9] Id. Rather, he largely repeats the same argument he made with regard to banning the application of the felony-murder rule to juveniles-namely, that "juveniles lack the ability to form the proper foreseeability, lack the appreciation of consequences, and are highly impulsive." However, we held in Propps that "[t]he constitutional analysis is not about excusing juvenile behavior, but imposing punishment in a way that is consistent with our understanding of humanity today." Propps , 897 N.W.2d at 102 (alteration in original) (quoting Lyle , 854 N.W.2d at 398 ).
Thus, in our previous juvenile sentencing cases, "we sought to eliminate the mandatory nature of mandatory minimums and sentences that were the functional equivalent of life without parole because those sentences did not offer juveniles a 'meaningful opportunity' to demonstrate their rehabilitation before the parole board." Id. at 101. Consequently, unlike the mandatory life without parole that adults who commit first-degree murder are subject to, there is no mandatory minimum term of confinement for juvenile offenders convicted of first-degree murder. Compare Iowa Code § 902.1(1) (2016), with id. § 902.1(2)(a )(2)-(3). Likewise, Iowa provides juvenile offenders convicted of first-degree murder "with an individualized sentencing *201 hearing that takes into account their youth and a number of other mitigating factors that provide juveniles with more leniency in the sentencing process." Zarate , 908 N.W.2d at 846. Compare Iowa Code § 902.1(1), with id. § 902.1(2)(b )(2)(a)-(v).
Similarly, the parole board provides juvenile offenders with "an individualized analysis that considers the juvenile's past, in addition to current psychiatric and psychological evaluations, the time already served on the sentence, any reports of misconduct or good behavior, and the inmate's attitude and behavior while incarcerated." Propps , 897 N.W.2d at 102 ; see also Iowa Code § 906.5(3). This individualized analysis allows the parole board to take into account the culpability of the offender, including the possibility that the offender was less culpable when he or she was aiding and abetting the principal actor in a felony-murder situation. We have repeatedly held that "the parole board [is] best situated to discern which juvenile homicide offenders have benefited from opportunities for maturation and rehabilitation." Propps , 897 N.W.2d at 102.
Unlike a sentencing judge, "[t]he parole board has the benefit of seeing the individual offender's actual behavior, rather than having to attempt to predict chances at maturity and rehabilitation based on speculation." Id. As a result, the parole board may decide to continue confinement of the juvenile "[i]f rehabilitation has not yet occurred" until he or she "has demonstrated through his or her own actions the ability to appreciate the severity of the crime." Id. "This is consistent with the approach of our prior holdings in the area of juvenile sentencing, because it allows for a realistic and meaningful opportunity for parole upon the juvenile's demonstration of maturity and rehabilitation." Id.
"In addition to our understanding and interpretation of the Iowa Constitution, we also consider whether the challenged sentencing practice serves legitimate penological goals and the culpability of the offender at issue." Zarate , 908 N.W.2d at 847. We traditionally take into account the penological goals of rehabilitation, retribution, deterrence, and incapacitation. Id. Nevertheless, rehabilitation is the primary consideration in the juvenile sentencing context "due to the increased capacity of juveniles to reform in comparison to adults." Id. In Zarate , we held that the statutory juvenile sentencing options of life imprisonment with the possibility of immediate parole, or life imprisonment with parole eligibility after a minimum term of confinement, "align with our focus on rehabilitation and allow sentencing judges to acknowledge the fundamental concept of our juvenile sentencing jurisprudence that children are different from adults and should be treated differently due to their increased potential for rehabilitation." Id.
Despite our emphasis on rehabilitation, juvenile sentences may still aim to promote additional penological goals, including deterrence, retribution, and incapacitation. We previously noted this in Roby , explaining, "[I]t may be appropriate retribution to incarcerate a juvenile for a short time without the possibility of parole. Additionally, a sentencing judge could properly conclude a short term of guaranteed incarceration is necessary to protect the public." 897 N.W.2d at 142. Ultimately, "[c]riminal punishment can have different goals, and choosing among them is within a legislature's discretion." State v. Oliver , 812 N.W.2d 636, 646 (Iowa 2012) (alteration in original) (quoting Graham , 560 U.S. at 71, 130 S.Ct. at 2028 ).
Though Harrison is correct to note that deterrence and retribution are *202 less applicable to juveniles due to their diminished culpability, they still carry "some weight depending on the circumstances of each case." Zarate , 908 N.W.2d at 854. As we declared in Propps , "[c]ompletely eliminating the mandatory imposition of a prison term, even when the term is indeterminate and the individual is immediately eligible for parole, would not serve the proportionality concept we have addressed in our previous juvenile sentencing cases." 897 N.W.2d at 101. "While juveniles may be more prone to reform and rehabilitation because of their age and the attendant characteristics of youth, they must also understand the severity of their actions." Id. at 102. Frankly, the "[h]arm to [the] victim is not lessened because of the young age of [the] offender." Id. Thus, "while youth is a mitigating factor in sentencing, it is not an excuse." Lyle , 854 N.W.2d at 398 (quoting Null , 836 N.W.2d at 75 ).
Juvenile offenders who choose to participate in inherently dangerous felonies, whether they are the principal actor or aid and abet the felony, demonstrate a certain lack of maturity and impulse control that particularly implicates the penological goals of incapacitation and rehabilitation. "Nothing that the Supreme Court has said" or that we have said "suggests trial courts are not to consider protecting public safety in appropriate cases through imposition of significant prison terms." Null , 836 N.W.2d at 75. Harrison is claiming that juveniles have uncontrollable impulses due to their youth that limit their ability to appreciate the gravity of their participation in an inherently dangerous felony. Importantly, sentencing juvenile offenders in his position to life imprisonment with the possibility of immediate parole takes this into account by allowing the parole board to examine maturity and rehabilitation and provides such offenders with a meaningful opportunity for release as soon as they meet these goals.
Overall, "the legislature is in the best position to identify and adopt legal protections that advance our constitutional recognition that 'children are different.' " Zarate , 908 N.W.2d at 851 (quoting Roby , 897 N.W.2d at 144 ). The legislature sought to prescribe "the most severe sentences for [juvenile] offenders convicted of murder in the first degree," including those juveniles convicted under the felony-murder rule. Louisell , 865 N.W.2d at 600. We are not in a position to undermine those goals given that the challenged sentencing practice aligns with our juvenile sentencing jurisprudence by promoting legitimate penological goals and providing juvenile offenders like Harrison with "a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " Id. at 602 (quoting Graham , 560 U.S. at 75, 130 S.Ct. at 2030 ). Therefore, we hold that sentencing juvenile offenders convicted of felony murder-whether they were the principal actor or aided and abetted-to life imprisonment with immediate parole eligibility is constitutional under both the Iowa Constitution and the United States Constitution.
2. As-applied challenge. Harrison argues his sentence of life imprisonment with the immediate possibility of parole is unconstitutional as applied to him because it is grossly disproportionate to his ultimate culpability. The Iowa and United States Constitutions both prohibit cruel and unusual punishment. See U.S. Const. amend. VIII ; Iowa Const. art. I, § 17. This prohibition "embraces a bedrock rule of law that punishment should fit the crime." Bruegger , 773 N.W.2d at 872.
We use a three-prong test to determine whether a sentence is grossly disproportionate under the Iowa and United *203 States Constitutions. First, we examine "whether the sentence being reviewed is 'grossly disproportionate' to the underlying crime," which "involves a balancing of the gravity of the crime against the severity of the sentence." Id. at 873. This is the threshold question, and we do not inquire any further if the challenged sentence does not appear grossly disproportionate based on this balancing. Oliver , 812 N.W.2d at 650. If the threshold is met, we then engage in the second step of our analysis in which we partake in an intrajurisdictional analysis, comparing the challenged sentence to sentences of other crimes in our jurisdiction. Bruegger , 773 N.W.2d at 873. Finally, we perform an interjurisdictional review, surveying the sentences for similar crimes in other jurisdictions. Id.
As we engage in this three-part inquiry, we must keep in mind certain general principles that help guide our determination of whether the challenged sentence is grossly disproportionate. "The first is that we owe substantial deference to the penalties the legislature has established for various crimes." Oliver , 812 N.W.2d at 650. Second, though we provide a more demanding review of a defendant's sentence for gross disproportionality under the Iowa Constitution than available under the United States Constitution, "it is rare that a sentence will be so grossly disproportionate to the crime as to satisfy the threshold inquiry and warrant further review." Id. Third, "a recidivist offender is more culpable and thus more deserving of a longer sentence than a first-time offender." Id. Finally, we analyze the facts of each case in reaching our threshold determination because they "can 'converge to generate a high risk of potential gross disproportionality.' " Id. at 651 (quoting Bruegger , 773 N.W.2d at 884 ).
For instance, in Bruegger , we held that the defendant's twenty-five year prison sentence for statutory rape was susceptible to an as-applied constitutional challenge because the unique features of the case "converge[d] to generate a high risk of potential gross disproportionality-namely, a broadly framed crime, the permissible use of preteen juvenile adjudications as prior convictions to enhance the crime, and a dramatic sentence enhancement for repeat offenders." 773 N.W.2d at 868, 884. We vacated his sentence and remanded the case for a new sentencing hearing that considered the constitutionality of his sentence. Id. at 886. Meanwhile, we held a sentence of life in prison without the possibility of parole for a defendant's second conviction of third-degree sexual abuse was not unconstitutional as applied to the defendant in Oliver . 812 N.W.2d at 651-53. In reaching this decision, we explained that the defendant's sexual exploitation of a minor who was twenty years younger than him was precisely the kind of exploitation that third-degree sexual abuse "was designed to prevent, not conduct that was inadvertently caught by a broadly written statute." Id. at 651.
Turning to the threshold inquiry, we cannot find that Harrison's sentence of life imprisonment with immediate parole eligibility for felony murder is grossly disproportionate to the underlying crime. Unlike the defendant in Bruegger , who committed an act "of lesser culpability" that fell within the scope of "a broadly-framed statute," felony murder does not encompass "acts of lesser culpability" since every felony murder requires a defendant's participation in a forcible felony that directly leads to the killing of the victim. Bruegger , 773 N.W.2d at 884 ; see Iowa Code § 707.2(1)(b ). Harrison directly participated in a forcible felony as an aider and abettor, which directly led to the death of Aaron McHenry. His actions of luring the victim to Collins and physically shoving the victim to help set up *204 the "lick" that resulted in the murder of McHenry are exactly the type of actions the felony-murder rule is meant to encompass. Though Harrison maintains he did not know ahead of time that Collins had a gun, Harrison was present when Collins shot McHenry, and he admitted he was in on the plan to rob McHenry. He was not an unknowing participant in the events that took place that day, and he showed no remorse during sentencing for his actions, simply declaring to the court, "[I]t's just crazy how I can just be judged by people that don't know what I've been through in my life." See State v. Knight , 701 N.W.2d 83, 88 (Iowa 2005) ("[A] defendant's lack of remorse is highly pertinent to evaluating his need for rehabilitation and his likelihood of reoffending.").
Moreover, his sentence does not involve "the permissible use of preteen juvenile adjudications as prior convictions to enhance the crime and a dramatic sentence enhancement for repeat offenders" like the defendant in Bruegger . See Bruegger , 773 N.W.2d at 884. Harrison does not argue that he was denied an individualized sentencing as required under our juvenile sentencing jurisprudence. Because Harrison is a juvenile offender, the district court was required to consider a number of mitigating circumstances, including his culpability, "[t]he nature of the offense," "[t]he commission of the murder while participating in another felony," and "[t]he circumstances of the murder including the extent of the defendant's participation in the conduct and the way familial and peer pressure may have affected the defendant." Iowa Code § 902.1(2)(b )(2)(e), (i), (s). Based on the sentencing court's assessment of Harrison's participation in the felony murder, it sentenced him to the minimum possible sentence for first-degree murder.
Further, the legislature's decision to designate felony murder committed by either the principal or aider and abettor as first-degree murder reflects the seriousness of this offense. The legislature sought to prescribe "the most severe sentences for [juvenile] offenders convicted of murder in the first degree," including those juveniles convicted under the felony-murder rule. Louisell , 865 N.W.2d at 600. "[W]e owe substantial deference to the penalties the legislature has established for various crimes." Oliver , 812 N.W.2d at 650. This conviction for first-degree murder, as an aider or abettor under a felony-murder theory, is not the rare case in which the unique features of the case "can 'converge to generate a high risk of potential gross disproportionality.' " Id. at 651 (quoting Bruegger , 773 N.W.2d at 884 ).
Finally, Harrison's argument that his sentence denies him of a meaningful opportunity for parole since "the ability of parole appears to be a legal fiction more than real opportunity" is not ripe for adjudication. We rejected similar arguments in both Louisell and Zarate since neither of those defendants had actually been denied parole in order to claim a legal violation. See Zarate , 908 N.W.2d at 847 ; Louisell , 865 N.W.2d at 601-02. The same ripeness issue occurs in this case since Harrison's claim is merely speculative. He has yet to appear before the parole board, and he does not provide any "basis for us to conclude that the parole board will fail to follow the law in a case that is presented to it, including his own." Zarate , 908 N.W.2d at 848.
In conclusion, life imprisonment with immediate parole eligibility for aiding and abetting in felony murder is not grossly disproportionate to the seriousness of the offense given the fatal harm Harrison helped enact on the life of another. Nevertheless, even if it were, Harrison's argument *205 would fail under our intrajurisdictional and interjurisdictional analyses since he received the most lenient punishment given to offenders convicted of felony murder. See Iowa Code § 707.2 ; id. § 902.1. Likewise, as we have noted previously, there is no national consensus against sentencing juvenile offenders convicted of felony murder-as the principal actor or aider and abettor-to life imprisonment with immediate parole eligibility. Therefore, Harrison's sentence of life imprisonment with immediate parole eligibility does not constitute cruel and unusual punishment, either categorically or as applied to Harrison.
D. Jury Instructions Regarding Robbery and the Felony-Murder Rule. Harrison argues the jury instructions did not properly inform the jury on the types of assault required to establish a felonious robbery. The jury was provided the following definitional instruction of robbery:
A person commits a robbery when, having the specific intent to commit a theft, the person commits an assault to assist or further the commission of the intended theft or the person's escape from the scene thereof with or without the stolen property.
The jury instructions also informed the jury on the definition of assault through the standard model instruction for a simple misdemeanor assault.[10] In 2016, approximately two years after Harrison committed the robbery at issue, Iowa Code section 711.3A went into effect. This Code section codified third-degree robbery-a misdemeanor that could not serve as a predicate for felony murder. See [ Iowa Code § 711.3A (2017) ]. Harrison now argues this change in the Code should be applied to him retroactively and the jury should have been instructed on the types of assault that would constitute forcible felony robbery.
Iowa Code section 4.13(1) provides that "[t]he reenactment, revision, amendment, or repeal of a statute does not affect ... the prior operation of the statute or any prior action taken under the statute." Iowa Code § 4.13(1)(a ). Section 4.13"does not require that the characterization of the crime of which [the defendant] is convicted be changed." State v. Chrisman , 514 N.W.2d 57, 63 (Iowa 1994). It is a well-settled law that substantive amendments to criminal statutes do not apply retroactively. See, e.g. , Nguyen v. State , 878 N.W.2d 744, 754-56 (Iowa 2016) (holding both the Iowa and Federal Constitutions only require "retroactive application of clarifications to existing substantive law, not changes to substantive law"); Dindinger v. Allsteel, Inc. , 860 N.W.2d 557, 563 (Iowa 2015) ("It is well established that a statute is presumed to be prospective only unless expressly made retrospective." (quoting Anderson Fin. Servs., LLC v. Miller , 769 N.W.2d 575, 578 (Iowa 2009) )). Since third-degree robbery did not exist in the Iowa Code at the time of Harrison's offense, Harrison was not entitled to a jury instruction differentiating between felony robbery and misdemeanor robbery.
E. Ineffective-Assistance Claims. Harrison presents a number of *206 ineffective-assistance-of-counsel claims. Criminal defendants have the right to effective assistance of counsel under both the Iowa Constitution and the United States Constitution. U.S. Const. amend. VI ; Iowa Const. art. I, § 10. "Generally, claims of ineffective assistance of counsel are preserved for postconviction relief proceedings." State v. Soboroff , 798 N.W.2d 1, 8 (Iowa 2011). Preserving these claims for postconviction relief allows the parties to develop an adequate record of the claims and provides the attorney charged with ineffective assistance with the "opportunity to respond to defendant's claims." Id. However, if "the record is adequate, we may resolve the claim on direct appeal." Id.
To prove ineffective assistance of counsel, the defendant must show "by a preponderance of the evidence both that counsel failed an essential duty and that the failure resulted in prejudice." Schlitter , 881 N.W.2d at 388. Since the defendant must show both prongs of this test have been met, we need not address the second prong regarding prejudice if the defendant fails to establish the first prong. Nguyen , 878 N.W.2d at 754. Crafting a trial strategy is inherently difficult, so we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. at 752 (quoting Strickland v. Washington , 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) ). In accordance with this presumption, counsel fails his or her essential duty by "perform[ing] below the standard demanded of a reasonably competent attorney." Ledezma v. State , 626 N.W.2d 134, 142 (Iowa 2001).
Further, prejudice results from counsel's failure to perform an essential duty when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 143 (quoting Strickland , 466 U.S. at 694, 104 S.Ct. at 2068 ). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland , 466 U.S. at 694, 104 S.Ct. at 2068 ). To meet this standard, the defendant must show that, "absent the errors, the fact finder would have had a reasonable doubt respecting guilt." Id. (quoting Strickland , 466 U.S. at 695, 104 S.Ct. at 2068 ).
1. Challenge to the use of felony robbery as a predicate felony . This claim of ineffective assistance involves the jury instructions utilized by the district court. Therefore, the record is adequate to resolve this claim on direct appeal. See Soboroff , 798 N.W.2d at 8. The relevant jury instructions at issue are as follows:
[a] person commits robbery when, having the specific intent to commit a theft, the person commits an assault to assist or further the commission of the intended theft or the person's escape from the scene thereof with or without the stolen property.
....
An assault is committed when a person does an act which is intended to either: 1. Cause pain or injury to another person; or 2. Result in physical contact which will be insulting or offensive to another person; or 3. Place another person in fear of immediate physical contact which will be painful, injurious, insulting or offensive to the other person when coupled with the apparent ability to do the act.
"Under the merger doctrine, a person is only guilty of felony murder if the act resulting in the predicate felony is *207 independent of the act resulting in death." Tribble , 790 N.W.2d at 128. We have never extended the merger doctrine to hold that felony robbery cannot serve as the predicate felony for felony-murder purposes. Nonetheless, Harrison claims his trial counsel was ineffective by failing to request jury instructions requiring the State to prove the felony robbery was an independent act from the murder. Harrison reasons the merger doctrine should apply to his case because his actions that caused the robbery were the same actions that caused the victim's death. Thus, to determine whether Harrison's attorney failed an essential duty by declining to request jury instructions on the merger doctrine, we must examine the validity of Harrison's merger argument.
Harrison premises his argument largely on our holding in Heemstra , in which the defendant was convicted of first-degree murder under a general verdict after the defendant shot and killed the victim during the course of an argument. 721 N.W.2d at 551. In that case, the district court instructed the jury on both premeditated murder and felony murder, informing the jury that it was required to find either that "[t]he defendant acted willfully, deliberately, premeditatedly, and with specific intent to kill" the victim, or that the defendant participated in the felony of willful injury as the predicate felony to murder. Id. at 552-53. On appeal, we held, "if the act causing willful injury is the same act that causes the victim's death, the former is merged into the murder and therefore cannot serve as the predicate felony for felony-murder purposes." Id. at 558. Consequently, the law requires the State to prove that felony assault was a separate act from the murder if felony assault is the predicate felony to murder given that "[d]eath is obviously a bodily injury." Id. at 555, 558 (quoting 4 Robert R. Rigg, Iowa Practice Criminal Law (1) § 3:16 (2006)). "Otherwise, all assaults that immediately precede a killing would bootstrap the killing into first-degree murder, and all distinctions between first-degree and second-degree murder would be eliminated." Id. at 557. Because the defendant's act of shooting the victim in Heemstra was both the act causing willful injury and the cause of the victim's death, we held the felony of willful injury merged into the murder and could not serve as the predicate felony for his felony-murder charge. See id. at 558.
In reaching this conclusion, we relied in part on a similar case from New York, People v. Moran , 246 N.Y. 100, 158 N.E. 35 (1927), which held that the predicate felony in a felony murder case must be independent of the assault that caused the victim's death. Heemstra , 721 N.W.2d at 557-58. To explain the merger doctrine, we specifically quoted the portion of Moran that stated, "The felony that eliminates the quality of the intent must be one that is independent of the homicide and of the assault merged therein, as, e.g., robbery or larceny or burglary or rape." Id. at 558 (emphasis added) (quoting Moran , 158 N.E. at 36 ).
Since Heemstra , we have considered similar felony-murder cases predicated on the forcible felony of felonious assault. In State v. Millbrook , we held "the fact that intimidation with a dangerous weapon is not a lesser-included offense of first-degree murder does not preclude application of the merger doctrine enunciated in Heemstra ." 788 N.W.2d 647, 652 (Iowa 2010). Nevertheless, we upheld the defendant's conviction because his act of aiding and abetting a codefendant in the commission of intimidation with a dangerous weapon with intent was sufficiently independent of his own firing of the gun into the crowd that caused the victim's death. Id. at 652-54. Likewise, we examined our *208 merger jurisprudence in Tribble , upholding a felony-murder conviction based on the felonious assault of willful injury due to the substantial evidence demonstrating the act of willful injury was sufficiently separate from the act of killing. Tribble , 790 N.W.2d at 128-29.
All of these cases dealt with the merger doctrine in relation to the forcible felony of assault, and none of them discussed extending the merger doctrine to cases that involve felony robbery as the predicate for felony murder. We even quoted other authorities in Heemstra that specifically stated the act of robbery was sufficiently independent from the act of killing to preclude it from being merged into the murder. See Heemstra , 721 N.W.2d at 556 ("Although rape, arson, robbery and burglary are sufficiently independent of the homicide, ... aggravated battery toward the deceased will not do for felony murder." (quoting Commonwealth v. Quigley , 391 Mass. 461, 462 N.E.2d 92, 95 (1984) )); see also id. at 558 ("The felony that eliminates the quality of the intent must be one that is independent of the homicide and of the assault merged therein, as, e.g., robbery or larceny or burglary or rape." (quoting Moran , 158 N.E. at 36 )). This is because robbery is clearly distinguishable from assault for the purpose of the merger doctrine.
Unlike the felonious assault at issue in Heemstra , felony robbery is not merely a less serious version of murder from which every felonious robbery ending in death could automatically be elevated to first-degree murder in the same way felonious assault could "bootstrap the killing into first-degree murder." Heemstra , 721 N.W.2d at 557. Rather, felony robbery is a distinct crime that necessitates the showing of a different intent from the killing. Under Iowa Code section 711.1(1), robbery requires a showing that the defendant had the "intent to commit a theft" and that the defendant committed an assault "to assist or further the commission of the intended theft or the person's escape from the scene thereof." Iowa Code § 711.1(1). Therefore, the concern that, absent the merger doctrine, all felony robberies "that immediately precede a killing would bootstrap the killing into first-degree murder, and all distinctions between first-degree and second-degree murder would be eliminated" is not implicated here as it was with felonious assaults in Heemstra . Heemstra , 721 N.W.2d at 557. Moreover, robbery-unlike willful injury-is expressly listed as a forcible felony under section 702.11(1) to qualify as a basis for felony murder. See Iowa Code § 702.11(1). Based on the fundamental differences between felony robbery and felony assault in the felony-murder context, in addition to the merger rule jurisprudence in Iowa, it can hardly be said that trial counsel in this case "performed below the standard demanded of a reasonably competent attorney." Ledezma , 626 N.W.2d at 142.
2. Evidentiary and testimonial objections . Harrison also maintains his trial counsel was ineffective in failing to challenge certain testimony and evidence presented at trial. Harrison asserts that his trial counsel should have objected to testimony and evidence presented at his trial regarding his codefendant's conviction for first-degree murder in the death of McHenry. Harrison also challenges trial counsel's decision not to object to certain testimony from Detective Youngblut. Harrison challenges trial counsel's decision to allow the testimony of Shirley Dick from Collins's trial to be read into the record since Dick passed away before Harrison's trial. Finally, Harrison argues his trial counsel was ineffective in failing to object to the playing of Dick's 911 call for the jury. However, the record is inadequate for us to address these claims. Like most *209 claims of ineffective assistance of counsel, we preserve these claims for postconviction-relief proceedings "so an adequate record of the claim can be developed and the attorney charged with providing ineffective assistance may have an opportunity to respond to defendant's claims." Soboroff , 798 N.W.2d at 8.
IV. Conclusion.
For the aforementioned reasons, we affirm the conviction and sentence for Harrison and preserve the additional claims of ineffective assistance of counsel for postconviction-relief proceedings.
AFFIRMED.
All justices concur except Wiggins, and Appel, JJ., who dissent, and Hecht, J., who takes no part.

Shirley Dick testified about the events she witnessed surrounding McHenry's death at Collins's trial, but she passed away before she was able to testify at Harrison's trial. The parties agreed to read her testimony into the record at Harrison's trial, and her testimony was admitted to the court as an exhibit. The parties also agreed to have Dick's 911 call reporting the gunshots played at trial.

The State argues that Harrison did not preserve error on this issue since he waited to raise it until after the State had presented its case on the felony-murder theory. We assume error is preserved without addressing this challenge.

Though Harrison was convicted in 2016, there has been no change in the felony-murder statute since the time of his trial. See Iowa Code § 707.2(1)(b ) (2016).

See, e.g. , State v. Herrera , 176 Ariz. 21, 859 P.2d 131, 140 (1993) (en banc) (rejecting a constitutional challenge to the Arizona felony-murder rule that claimed the rule unconstitutionally presumed the defendant's intent to kill based on the intent to commit the underlying felony); Dillon , 194 Cal.Rptr. 390, 668 P.2d at 717-18 (holding the felony-murder rule does not create a conclusive presumption of the existence of an element of the crime in violation of the Due Process Clause of the Fourteenth Amendment since malice aforethought is not an element of felony murder); State v. Goodseal , 220 Kan. 487, 553 P.2d 279, 286 (1976) (holding the felony-murder rule did not constitute cruel and unusual punishment or the denial of equal protection and due process since "it is to protect human life, represents sound public policy, is reasonably related to the end sought to be accomplished and is not constitutionally impermissible"), overruled on other grounds by State v. Underwood , 228 Kan. 294, 615 P.2d 153, 162-63 (1980) ; Evans v. State , 28 Md.App. 640, 349 A.2d 300, 329-30, 336-37 (1975) (holding the felony-murder rule did not violate due process because it is not a "mere pale reflection[ ] of willful, deliberate, and premeditated killing" since it has a different substantive definition of murder); Commonwealth v. Watkins , 375 Mass. 472, 379 N.E.2d 1040, 1049 (1978) (The felony-murder rule is not unconstitutional under the Fourteenth Amendment because "[t]he Commonwealth is not, pursuant to the operation of the felony-murder rule, 'relieved' of its duty prescribed by the United States Supreme Court in In re Winship , 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed. 2d 368 (1970), of proving every fact necessary to the crime as charged beyond a reasonable doubt. Nor is the burden of proof as to an element of the crime charged 'affirmatively shifted' from the Commonwealth to the defendant as prohibited by the Supreme Court in Mullaney v. Wilbur , 421 U.S. 684, 701, 95 S.Ct. 1881, 44 L.Ed. 2d 508 (1975)."); State v. Burkhart , 325 Mont. 27, 103 P.3d 1037, 1046-47 (2004) (holding the felony-murder rule does not violate due process since intent to kill is not an element of the crime under the felony-murder rule); State v. Bradley , 210 Neb. 882, 317 N.W.2d 99, 101-02 (1982) (rejecting defendant's argument that the felony-murder rule conclusively presumes malice from the criminal intention to commit certain felonies and therefore violates "the rule against irrebuttable presumptions [as] stated in Mullaney v. Wilbur , 421 U.S. [684] 685, 95 S. Ct. 1881 [44 L.Ed.2d 508] ... (1975)"); State v. Campos , 122 N.M. 148, 921 P.2d 1266, 1272 (1996) ("[T]he felony-murder doctrine in New Mexico does not abandon the mens rea requirement for murder, nor does it create a presumption that a defendant had intended to kill whenever a homicide occurs during the course of a felony. Our felony-murder rule only serves to raise second-degree murder to first-degree murder when the murder is committed in the course of a dangerous felony." (Citation omitted.)); State v. Swift , 290 N.C. 383, 226 S.E.2d 652, 668-69 (1976) (holding the felony-murder rule does not involve any presumption of premeditation and deliberation that would violate the Due Process Clause of the Fourteenth Amendment because those are not elements of the crime of felony murder); Gore v. Leeke , 261 S.C. 308, 199 S.E.2d 755, 757 (1973) (holding the felony-murder rule did not violate the Due Process Clauses of the South Carolina and Federal Constitutions because it does not create a conclusive presumption of malice that would allow the "defendant to be convicted of murder without the State's proving the element of malice beyond a reasonable doubt"); State v. Wanrow , 91 Wash.2d 301, 588 P.2d 1320, 1325 (1978) (en banc) ("The argument that the felony-murder presumes the existence of intent to kill misconstrues the nature of the felony-murder rule and must be rejected."), superseded by statute as recognized in In re Pers. Restraint of Andress , 147 Wash.2d 602, 56 P.3d 981, 984, 988 (2002) ; State ex rel. Peacher v. Sencindiver , 160 W.Va. 314, 233 S.E.2d 425, 426-27 (1977) (rejecting a constitutional challenge to the felony-murder rule under the Due Process Clauses because the felony-murder rule does not require a showing of malice and therefore does not create a presumption that defendant committed the killing with malice).

California is the only state we are aware of that has considered abolishing the application of the felony-murder rule to juvenile offenders on constitutional grounds. This was based on the argument that juvenile offenders cannot foresee the consequences of their actions. A California Court of Appeal rejected this argument. People v. Richardson , No. A134783, 2013 WL 2432510, at *5 (Cal. Ct. App. June 4, 2013) (rejecting a juvenile offender's argument that his conviction for felony murder violated his due process rights because his age rendered him incapable of foreseeing the consequences of his decision to participate in a robbery and noting that "[w]here, as in this case, the killing occurred during the course of an independent felony (robbery), Richardson's participation in the commission of that crime made him liable for the murder committed during the course of the robbery, even if the killing was not a natural, reasonable, or probable consequence of that crime").

See Haw. Rev. Stat. Ann. § 707-701 (West, Westlaw through Act II of the 2018 Reg. Sess.) (first-degree murder requires the actor to commit the killing "intentionally and knowingly"); Ky. Rev. Stat. Ann. § 507.020 (West, Westlaw through Chs. 74, 96-154, 158-164, & 170 of 2018 Reg. Sess.) (first-degree murder requires "intent to cause the death of another person"); Ohio Rev. Code Ann. § 2903.01(B) (West, Westlaw through File 66 of 132d Gen. Assemb. (2017-2018)) (requiring a person to "purposely" cause the death of another during the course of a felony in order for the crime to meet the definition of aggravated murder); People v. Aaron , 409 Mich. 672, 299 N.W.2d 304, 328-29 (1980) ("We conclude that Michigan has no statutory felony-murder rule which allows the mental element of murder to be satisfied by proof of the intention to commit the underlying felony. Today we exercise our role in the development of the common law by abrogating the common-law felony-murder rule.").

We are also not aware of any state that has considered a categorical challenge to the specific sentence of life imprisonment with immediate parole eligibility for a juvenile offender convicted under the felony-murder rule. One state, North Carolina, has similarly considered a constitutional challenge to the sentence of life with the possibility of parole after a prison term of twenty-five years for a juvenile offender convicted under the felony-murder rule. See State v. Jefferson , --- N.C. App. ----, 798 S.E.2d 121, 122-23 (2017). The North Carolina Court of Appeals upheld the constitutionality of the sentence as applied to the defendant, noting it was "neither an explicit nor a de facto term of life imprisonment without parole."Id. at 125.
A few other states have considered the constitutionality of lengthy term of years sentences or sentences of life imprisonment for juvenile offenders convicted under the felony-murder rule. Those states have declined to find such sentences are categorically unconstitutional. See Bell v. State , No. CR 10-1262, 2011 WL 4396975, at *2-3 (Ark. Sept. 22, 2011) (rejecting defendant's petition for recall and resentencing involving his sentence to two consecutive life sentences for his convictions on two counts of first-degree murder committed as an accomplice when he was sixteen years old and that "[n]otwithstanding his claim that he was only an accomplice, we have held that there is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned"); People v. Jordan , No. D064010, 2016 WL 6996216, at *14 (Cal. Ct. App. Nov. 30, 2016) (upholding the twenty-five-year-to-life sentence of juvenile offenders convicted of felony murder noting other California appellate courts "have rejected arguments by juvenile offenders that a sentence for first degree murder violates the proportionality principle of the California Constitution even though the defendant was not the person who committed the killing, when the defendant knowingly participated in a serious crime that led to the murder"); Arrington v. State , 113 So.3d 20, 27-28 (Fla. Dist. Ct. App. 2012) (declining to adopt a categorical rule prohibiting the sentence of life imprisonment without the possibility of parole for juvenile offenders convicted under the felony-murder rule); State v. Ali , 855 N.W.2d 235, 258-59 (Minn. 2014) (noting the constitutionality of life sentences for juveniles convicted of felony murder); cf. Dillon , 194 Cal.Rptr. 390, 668 P.2d at 700-01, 727 (holding a seventeen year-old's sentence of life imprisonment for felony murder was unconstitutional as applied where the offender fatally shot his victim out of fear for his life in the course of trying to steal marijuana plants from the victim's farm when the victim-who had previously made threats about shooting the defendant for being on his property-began approaching the defendant with a shotgun in his possession.)

A sampling of the sentencing statutes of other states reveals that most states do not distinguish between premeditated murder and felony murder for the purpose of sentencing juvenile or adult offenders. See, e.g. , Ala. Code § 13A-6-2 (Westlaw through Act 2018-579) (classifying felony murder as first-degree murder and codifying the punishment for juvenile offenders who commit murder to be either life imprisonment without parole or life); Alaska Stat. Ann. § 11.41.100(a)(2)-(5) (West, Westlaw through ch. 7 of 2018 2d Reg. Sess.) (classifying felony murder as first-degree murder); id. § 12.55.125(b) (treating all types of first-degree murder the same for sentencing purposes); Ariz. Rev. Stat. Ann. § 13-1105(A)(2) (Westlaw through May 18, 2018 of 2d Reg. Sess.) (classifying felony murder as a form of first-degree murder); id. § 13-751(A)(2) (A juvenile offender convicted of first-degree murder "shall be sentenced to imprisonment in the custody of the state department of corrections for life or natural life."); Ark. Code Ann. § 5-10-101 (West, Westlaw through Acts 1-3, 5, 11, 12 & 13 from 2018 2d Extraordinary Sess.) (designating felony murder a capital offense and mandating any defendant under eighteen "at the time he or she committed the capital murder [be sentenced to] life imprisonment with the possibility of parole after serving a minimum of thirty (30) years' imprisonment"); Del. Code Ann. tit. 11, § 636 (classifying felony murder as murder in the first degree) (West, Westlaw through 81 Laws 2018, chs. 200-253); id. 4209A (All juvenile offenders who are convicted of first-degree murder "shall be sentenced to term of incarceration not less than 25 years to be served at Level V up to a term of imprisonment for the remainder of the person's natural life to be served at Level V without benefit of probation or parole or any other reduction."); Ga. Code Ann. § 17-10-6.1(a)(1), (c)(1) (West, Westlaw through Act 562 of 2018 Leg. Sess.) (listing "[m]urder or felony murder" as "serious violent felon[ies]" for which adult and juvenile offenders can be sentenced to life imprisonment with a minimum term of thirty years in prison before any form of parole eligibility is available); Idaho Code Ann. § 18-4004 (West, Westlaw through 2018 2d Reg. Sess.) ("[E]very person guilty of murder of the first degree shall be punished ... by imprisonment for life."); id. § 18-4003(d) (classifying felony murder as first-degree murder); La. Stat. Ann. § 14:30(A) (Westlaw through 2018 1st Extraordinary Sess.) (defining first-degree murder, which includes felony murder); id. § 15:574.4(E)(1)(a) (A juvenile offender convicted of first-degree murder may become parole eligible after "[t]he offender has served twenty-five years of the sentence imposed"); Nev. Rev. Stat. Ann. § 200.030 (West, Westlaw through 2017 Reg. Sess.) (classifying felony murder as first-degree murder and subjecting defendants convicted of first-degree murder to a minimum sentence of twenty years imprisonment before parole eligibility); Tex. Penal Code § 19.03 (West, Westlaw through 2017 Reg. & 1st Called Sess.) (including "capital felony" in the definition of "capital murder"); id. § 12.31(1) ("An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for: (1) life, if the individual committed the offense when younger than 18 years of age.).
North Carolina is the only state we are aware of that differentiates between premeditated and felony murder for juvenile sentencing purposes. Under this statute, an offender convicted of first-degree murder under the felony-murder rule shall be sentenced "to life imprisonment with parole." N.C. Gen. Stat. Ann. § 15A-1340.19B(a)(1) (West, Westlaw through 2017 Reg. Sess.). For juvenile offenders, " 'life imprisonment with parole' shall mean that the defendant shall serve a minimum of 25 years imprisonment prior to becoming eligible for parole." Id. § 15A-1340.19A. Meanwhile, a defendant convicted of premeditated first-degree murder "should be sentenced to life imprisonment without parole ... or a lesser sentence of life imprisonment with parole." Id. § 15-1340.19B(a)(2). Nevertheless, this sentencing scheme still requires juvenile offenders in North Carolina to serve a definite term of imprisonment that exceeds Harrison's sentence of life imprisonment with immediate parole eligibility.

Harrison does argue along these lines in his reply brief regarding his as-applied challenge. Specifically, Harrison notes that he is eligible for parole under his current sentence, but "the ability of parole appears to be a legal fiction more than a real opportunity." Thus, we will address that argument as part of his as-applied challenge.

Jury Instruction No. 28 defined "assault":
An assault is committed when a person does an act which is intended to either:
1. cause pain or injury to another person; or
2. result in physical contact which will be insulting or offensive to another person; or
3. place another person in fear of immediate physical contact which will be painful, injurious, insulting or offensive to the other person when coupled with apparent ability to do the act.