**IN THE COURT OF APPEALS OF IOWA**

No. 17-1701
Filed June 5, 2019

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**STEVE W. FORDYCE II,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, David P. Odekirk, Judge.

The defendant appeals his conviction for voluntary manslaughter. **AFFIRMED.**

Christopher Kragnes, Sr., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Israel J. Kodiaga and Linda J. Hines, Assistant Attorneys General, for appellee.

Heard by Vaitheswaran, P.J., and Potterfield and Tabor, JJ.

**POTTERFIELD, Judge.**

Steve Fordyce[1] appeals his conviction after bench trial for voluntary manslaughter. He claims (1) the State did not present substantial evidence to disprove his justification defense beyond a reasonable doubt, (2) the district court erred in not applying the amended Iowa Code chapter 704 (2017)—also known as the "stand your ground" law—to his case, and (3) his due process rights were violated by the length of time between his trial and the entry of the district court's verdict.

**I. Prior Facts and Proceedings.[2]**

On August 14, 2015, Fordyce and his two six-year-old children visited Fordyce's sister, Nikki, at Nikki's residence on West First Street in Waterloo. Nikki's property abuts Samantha Harrington's Locust Street property; the properties are partially divided by a fence. While Fordyce and the children visited Nikki, Fordyce's red pickup truck was parked in Nikki's driveway. At some point during this visit, Fordyce's children are alleged to have thrown fruit-snack wrappers over the fence into Samantha's yard.

Around the same time, Donald Harrington walked across the street to visit Samantha, his estranged wife, at her Locust Street residence.[3] Donald was

---

[1] Fordyce is referred to as both Steve Fordyce Jr. and Steve Fordyce II throughout the various court filings.

[2] In a case tried to the bench, "[t]he trial court's findings of fact upon conflicting evidence are binding upon us if supported by substantial evidence." *State v. Bond*, 340 N.W.2d 276, 279 (Iowa 1983). Fordyce "agrees" in his appellate brief that "the trial court's findings of facts . . . are supported by substantial evidence." As the facts are not disputed, we adopt the substance of the district court's recitation of facts as our own, though we have incorporated those findings in our own narrative form and include information about the prior proceedings as well.

[3] Samantha and Donald were married at the time of the incident, but he did not reside at the Locust Street property with her.

coming from his adult nephew's birthday party, where Donald had consumed one or two beers. Donald was calm and not agitated when he left for Samantha's residence.

According to Samantha's testimony, Donald called her around 6:30 or 7:00 p.m. that night and wanted to see her. Once Donald arrived, the two sat on the front porch of the Locust Street residence. Donald asked who drove the red truck parked next door, and Samantha told him the truck belonged to Nikki's brother. Donald told Samantha garbage was being thrown over the fence; he was "visibly shaken" and upset as he told her. Samantha tried to change the subject of their conversation to calm him down.

While Samantha and Donald sat on the porch together, they observed Fordyce back his red pickup out of the driveway. Samantha testified that as Fordyce drove by, Donald "flipped the bird" at Fordyce. Fordyce stopped his truck in front of Samantha's property. Donald, whom Samantha described as upset, left the porch and proceeded to walk toward Fordyce's vehicle. Donald was a large person, standing at approximately six feet three inches tall and weighing about 281 pounds. Samantha testified once Donald reached Fordyce's truck, Donald tried to open the truck door but the door was locked. Samantha opined that Donald would not have been able to see Fordyce's children—who were seated in the back seat of the truck—due to the dark windows.

Fordyce made a questioning gesture in response to Donald giving him the finger. Fordyce reported he and Donald had never had any problems with each other and he was confused as to what triggered Donald's hostile behavior. Although Fordyce has some hearing difficulties, he was able to make out that it

had something to do with the children's fruit snacks. Fordyce had a gun on his person while in the truck, which he had a lawful permit to carry. According to Fordyce's later statement to police, he carries a gun in his pocket "ninety-five percent of the time." Fordyce did not brandish or point the weapon at Donald at that time.

After unsuccessfully attempting to get in Fordyce's truck, Donald then attempted to provoke Fordyce into a fight by saying something to the effect of "Come on. You want to go?" Fordyce sped away before Donald walked around the back of the truck.

Donald then walked back to the porch. Samantha flagged down two of her children's friends and instructed them to find her boys because she thought something was going to happen. Samantha and Donald expected more trouble.

Fordyce drove up the street and made a U-turn, returning to Nikki's house, where Nikki and Katia[4] were sitting on the porch. Fordyce parked on Nikki's lawn in front of her house, rolled down his window, and, from his truck, told Nikki and Katia what had just happened so Nikki would have warning if any drama resulted with Donald and Samantha. Nikki and Katia ran next door to confront Samantha and Donald. Fordyce told his kids to stay in the truck before getting out to follow Nikki and Katia. Fordyce followed them because he was worried about what might happen; Fordyce believed Donald was "on something" at the time.

---

[4] We have no indication of Katia's age; she may have been a minor at the time of this incident. We err on the side of caution and refer to her by her first name only. *See, e.g.*, *State v. Tyler*, 873 N.W.2d 741, 745 n.2 (Iowa 2016) ("We refer to juvenile witnesses by initials only.").

Samantha and Donald were sitting on the porch when they saw Nikki, Katia, and Fordyce approaching Samantha's residence on the sidewalk. Nikki was in front of the group, and Fordyce was trailing behind the two women. Samantha got up to confront Nikki and Katia at the bottom of the porch steps. The women all argued with one another, but Fordyce stood back as an observer and did not say anything or join in any way. He stood near Samantha's property line but remained on Nikki's side of the property line throughout the incident.

Samantha had known Fordyce for three to four years, but she was unaware that he carried a gun. Donald and Fordyce had not personally interacted in many years, although they knew of each other; Fordyce was aware of allegations of Donald's past drug use. Fordyce had a violent encounter with Donald's brother, John Harrington, many years before this incident, but it did not involve Donald. Samantha and Nikki, however, had ongoing and serious disputes with one another that involved violent behavior. In fact, Samantha testified that just three days prior to August 14, 2015, Nikki had attacked her on her front porch. Samantha says she felt terrorized by Nikki but acknowledged Fordyce was never involved in this.

Donald apparently was not concerned with Nikki and Katia. However, while Samantha was arguing with Nikki at the bottom of the porch steps, Donald became upset when he saw Fordyce. Donald's angry behavior was directed at Fordyce and not the women. Donald moved quickly from the porch toward Fordyce, who was standing in the driveway on his sister's property. Under cross-examination, Samantha admitted telling the police that Donald wanted to fight Fordyce at that time.

As Donald approached Fordyce, Nikki announced Fordyce had a gun and asked Donald what he was going to do now. Samantha then saw Fordyce standing approximately three feet from Donald with a gun in his hand pointed at Donald; she had not seen the gun prior to that. Fordyce had the gun in his pocket and had not brandished it prior to Donald rushing at him. According to Samantha's testimony, Donald had his hands outstretched in the air but was holding nothing but a cell phone. Samantha recalled Donald asking Fordyce if Fordyce was going to shoot him before saying something along the lines of "shoot me then."

The State provided as evidence a recording of a voice message discovered on John Harrington's phone from the time of the incident. This message was made by Donald's phone calling John's phone, and it recorded some of the incident after Nikki arrived at Samantha's home. Donald can be heard saying something to the effect of "it's over with," "fucking kill you," and "go ahead, go ahead." Donald sounds agitated and is not calm in the voice recording. Nikki can be heard on the recording stating, "[Fordyce] has a gun." There is no evidence Fordyce verbally engaged with either Samantha or Donald during this incident.

According to Fordyce's statement to police officers, Donald then charged at him. Fordyce felt threatened, especially considering his history with Donald's brother, so he backed up, drew his weapon, and fired. Fordyce shot three or four rounds from his Glock model 27 .40 caliber handgun. Fordyce moved several feet while firing the gun; he did not initiate the process to draw and shoot his gun until after Donald charged at him. Samantha estimated it took approximately four

seconds from the time Donald left the steps until the time he was shot. It is undisputed Fordyce shot and killed Donald on August 14.

The firearms-testing report completed by Carl Bessman of the Iowa Department of Criminal Investigation Criminalistics Laboratory found the middle hole on the front of Donald's shirt was caused by a shot fired with the muzzle of the pistol at some distance greater than two feet but less than four feet. Bessman's testing found the upper hole on the front of Donald's shirt and the hole in the back of that shirt were caused by shots fired with the muzzle of the pistol at some distance of three feet or greater from the shirt. These distances are consistent with the descriptions of Samantha and Fordyce concerning how close Donald was to Fordyce at the time of the shooting.

The location of the recovered bullet casings are consistent with Fordyce stepping away from Donald as he fired the gun. Donald remained standing following the first two shots but fell after being hit the third time. Fordyce then walked back to his truck, put the gun in the glove box, and told his children to get inside the house. He locked the truck and waited for law enforcement to arrive.

When officers arrived on scene, Nikki, Katia, and Fordyce were sitting on the front porch of Nikki's residence. Fordyce admitted to officers that he shot Donald but informed them he believed this was self-defense. Fordyce informed officers the handgun he used was in his pickup, and the officers seized a Glock model 27 .40 caliber handgun—which testing confirmed was the weapon used in the shooting incident—as well as a 9 mm handgun found in Fordyce's vehicle.

Officer Edward Savage testified he instructed Fordyce to sit in the back of the patrol car and that, at the time, Fordyce was calm—not upset, agitated,

afraid, or injured. Investigator Brice Lippert, who asked Fordyce to come to the station for questioning, also testified the Defendant was "oddly calm" but indicated Fordyce was cooperative.

Fordyce was transported to the Waterloo Police Department for questioning. Investigator Christopher Gergen described Fordyce as calm during the interview, and Fordyce did not complain to him of any injuries. Fordyce's cell phone was seized during the interview, and he willingly provided his passcode to access the cell phone. During his testimony, Investigator Gergen acknowledged he told Fordyce investigators would attempt to obtain surveillance from the area to see what happened and Fordyce said that would be fine. However, no surveillance videos were found.

On August 25, Fordyce was charged with first-degree murder in the shooting death of Donald.

He entered a plea of not guilty, and he filed notice of his intent to assert the defenses of justification and defense of another.

The matter proceeded to a seven-day trial to the bench in August 2016. Doctor Julia Goodin, Iowa's Chief Medical Examiner at the time, performed the autopsy on Donald and testified to her findings during trial. Dr. Goodin determined Donald's death was caused by four gunshot wounds to the chest/upper extremity. The autopsy revealed Donald had a blood alcohol content of .068, which Dr. Goodin noted was lower than the legal limit to drive in Iowa. Donald's first urine screen came back positive for amphetamines, but a subsequent, more accurate test came back negative for amphetamines. Dr.

Goodin determined the first test was a false positive and concluded Donald was not under the influence of amphetamines at the time of his death.

The defense called two expert witnesses. The first, Doctor Mace Beckson, is a certified forensic psychiatrist. Dr. Beckson had not met Fordyce and had no opinions on Fordyce's mental capacity, but Dr. Beckson testified he had reviewed the case as well as Fordyce's medical records. Dr. Beckson testified there are a wide range of "normal" responses to a traumatic event and setting aside emotions to get through a situation was not abnormal. Additionally, Dr. Beckson testified to his familiarity with substance abuse and long-term effects of substances, including but not limited to alcohol, on brain function. According to Dr. Beckson, long-term use of amphetamines—as Donald had a history of—can cause paranoid, suspicious, or delusional behavior. High use of the drug can cause psychosis and agitation. Dr. Beckson noted a negative toxicology result indicates the individual did not use the tested substance recently but could also mean the cutoff rate for testing was too high to detect a minimal presence of the substance.

Emanuel Kapelsohn was also called as an expert witness in regards to his knowledge of firearms and self-defense. Mr. Kapelsohn opined on factors related to the use of self-defense, ability to retreat, and deadly-force protocols. Mr. Kapelsohn also engaged in a demonstration to indicate how action is faster than reaction in a situation with an aggressor.

The case was deemed submitted to the court in September 2016.

Before the district court issued a ruling, the Iowa Legislature passed House File No. 517—also known as the "stand your ground" law—which amended parts of Iowa Code chapter 704.

In August 2017, Fordyce filed a motion asking the court to apply the law to the facts of his case. In his motion, he asserted that House File No. 517 "merely clarified the ambiguous nature of whether there was a duty to retreat while acting in self-defense or defense of another." Additionally, he asserted that applying the law change to his case would "not involve retroactivity, in the sense of the application of a change in law to overturn a judicial adjudication of rights that has already become final" because no verdict had yet been entered. He also asked the court to consider the rule of lenity in determining whether to apply the law change. Finally, he claimed that refusing to apply the law change would "result in the Defendant being denied his right to Due Process and Equal Protection of the law under Iowa Constitution Article I, sections 1, 9, and 10 and the Fifth and Fourteenth Amendments of the United States Constitution."

On August 29, 2017, approximately eleven months after the case was submitted, the district court entered its verdict. In its written ruling, the court first denied Fordyce's motion to apply "stand your ground" to his case, determining that because it was a change in substantive law it should not be applied retroactively to Fordyce's actions. The court then considered whether the State had disproved Fordyce's defenses and ruled Fordyce could not rely on self-defense or defense of others because (1) Fordyce "continued the incident when he came back and accompanied his sister and Katia when they confronted Samantha" and "Nikki and Katia were both initiating a further escalation of

tension with Donald and Samantha, as well as continuing the course of events set in motion initially by Donald" and (2) Fordyce "could have pursued an alternative course of action by retreating sooner once he was aware that Donald was coming toward him." Still, the court acquitted Fordyce of murder in the first degree and murder in the second degree, finding the State had not proved Fordyce had the necessary intent at the time he shot Donald. The court found Fordyce guilty of voluntary manslaughter, stating:

> The court further finds that the State has proven beyond a reasonable doubt that the shooting was done solely by reason of sudden, violent and irresistible passion resulting from serious provocation. The court finds that Donald's actions charging [Fordyce], together with his threats to kill or harm [Fordyce], were a serious provocation. Donald's actions at the time he charged [Fordyce] would cause a reasonable person to have a sudden, violent and irresistible passion. The court finds there was no interval of time during which a reasonable person would, under the circumstances, have time to reflect and bring his passion under control and suppress the impulse to kill.

Fordyce filed a motion for new trial, pursuant to Iowa Rule of Criminal Procedure 2.24(2)(b)(6) and (9). He claimed the court's refusal to apply the stand your ground law to his case was a denial of his right to due process and equal protection, the eleven-month delay between the submission of the case to the court and the court's ruling being issued violated his right to a fair and speedy trial, and the State failed to prove beyond a reasonable doubt Fordyce did not act in self-defense.[5]

At the scheduled sentencing hearing, the court heard arguments from both Fordyce and the State regarding the motion for new trial before ultimately

---

[5] Fordyce also challenged the district court's rulings as to some evidentiary matters; he has not renewed those complaints on appeal.

denying the motion. As to the issue of the delay before the ruling, the court stated:

> Concerning the timeliness of the decision, no doubt the decision took a lengthy amount of time and the court will acknowledge more time than I would have ever wanted it to take. I do note that for the purposes of this record that the court's findings of fact were done actually within several weeks of the completion and submission of the trial. It was the consideration and the analysis of the law as to those facts which ended up taking additional time and, in fact, in this case, I can assure both parties that the court spent a great deal—amount of time wrestling with the application of the law in this case to the evidence that was presented. And so if anything, I believe the court has afforded complete and full due process to the defendant in every respect as far as consideration of the evidence and the application—the court's application of the law in this case.

Fordyce was sentenced to an indeterminate term of incarceration not to exceed ten years. He appeals.

## II. Discussion.

### A. Sufficiency of the Evidence.

Fordyce maintains the State failed to provide substantial evidence to prove beyond a reasonable doubt that Fordyce did not act with justification—in either self-defense or defense of others—in shooting Donald. *See State v. Rubino*, 602 N.W.2d 558, 565 (Iowa 1999) (recognizing the State has the burden, "when the defense is raised," "to prove beyond a reasonable doubt . . . the alleged justification did not exist"). "When reviewing such a claim, the evidence is viewed in the light most favorable to the State, all inferences that are fairly and reasonably deducted from the evidence are accepted, and all the evidence, not just that supporting the verdict, is considered." *State v. Elam*, 328 N.W.2d 314, 319 (Iowa 1982).

"Justification as a defense is two-pronged: an admission that a proscribed act was done, and the establishment of an exculpatory excuse that takes the act out of the criminal law." *State v. Jeffries*, 313 N.W.2d 508, 509 (Iowa 1981). The defense is codified in Iowa Code section 704.3 (2015), which states, "A person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself or another from any actual or imminent use of unlawful force."

To prove Fordyce was not justified in acting in self-defense, the State has to prove any one of the following:

> 1. The defendant started or continued the incident which resulted in death; or
> 2. An alternative course of action was available to the defendant; or
> 3. The defendant did not believe he was in immediate danger of death or injury and the use of force was not necessary to save himself; or
> 4. The defendant did not have reasonable grounds for the belief; or
> 5. The force used by the defendant was unreasonable.

*State v. Coffman*, 562 N.W.2d 766, 768 (Iowa Ct. App. 1997) (citation omitted).

The district court concluded Donald was not acting in self-defense for two reasons: first, because he continued the incident that resulted in Donald's death when he came back and accompanied his sister and Katia while they confronted Samantha and Donald. Additionally, the court concluded Fordyce had an alternative course of action available to him by retreating sooner once he was aware that Donald was coming toward him. Fordyce argues the district court's finding of facts do not support these conclusions.

Regarding the continuation of the incident, Fordyce notes the court determined Donald was the initial aggressor when he flipped off Fordyce and then walked up to Fordyce's truck, trying to gain entrance into it and provoking Fordyce by asking, "Come on. You want to go?" Fordyce asserts that his action of following Katia and Nikki to the border of Nikki's property when they entered Samantha's property and then standing by while the others engaged in a verbal altercation does not constitute continuing the incident. We agree. According to the district court's fact findings, Fordyce stayed on Nikki's property, did not engage in a verbal altercation, and did not brandish his weapon—which he had a legal permit to carry and was already in his possession before the incident began—until Fordyce rushed at him. We cannot say Fordyce's presence, at a distance, at a point where he could observe Donald is enough to determine Fordyce continued the prior incident.

But we agree with the district court that Fordyce had an alternative course of action available to him. There were no physical barriers to Fordyce retreating.[6] *See, e.g., State v. Rubino*, 602 N.W.2d 558, 565 (Iowa 1999) (finding substantial proof the defendant's reliance on the justification defense was unfounded because "[w]hen a shot was fired to scare them off, [the defendant] could have retreated"); *Wright v. State*, No. 16-0518, 2017 WL 4049317, at *6 (Iowa Ct. App. Sept. 13, 2017) (finding an alternative course of action was available to the defendant because he "could have continued to run"). Fordyce maintains there

---

[6] We acknowledge there was some testimony that Fordyce may have had a fractured foot at the time of the shooting, but the district court specifically found that Fordyce's various ailments were not factors at the time of the shooting. Moreover, there was no evidence of Fordyce otherwise struggling to walk or get around.

was no time to flee and he could not back up or leave because "to retreat at this stage would leave the two individuals he had originally followed with a further crazed individual." This argument conflates the two separate justifications for his action—self-defense and defense of others. Insofar as he argues he was defending himself in shooting Donald, nothing prevented Fordyce from fleeing. Because substantial evidence supports one of the alternatives, we agree with the district court conclusion Fordyce was not justified by self-defense in shooting Donald. Whether Fordyce could use deadly force against Donald in defense of others is a separate question.

To prove Fordyce was not justified in acting in defense of others, the State has to prove any one of the following:

> 1. The defendant knew the person he helped had started or continued the incident, or the defendant himself started or continued the incident which resulted in injury death.
> 2. An alternative course of action was available to the defendant.
> 3. The defendant did not believe the person he helped was in imminent danger of death or injury and the use of force was not necessary to save the person.
> 4. The defendant did not have reasonable grounds for the belief.
> 5. The force used by the defendant was unreasonable.

Iowa Crim. Jury Instructions 400.3.

Although Fordyce argues there was no alternative course of action—such as fleeing—that could protect himself, Katia, and Nikki, Fordyce cannot successfully rely on defense of others for his justification. He knew Katia and Nikki chose to run over to Samantha's home and start a verbal altercation with Samantha and Donald, whether that constituted starting a new incident or a continuation of the incident between Donald and Fordyce.

Substantial evidence disproves Fordyce's justifications of self-defense and defense of others.[7]

**B. Stand Your Ground Law.**

Fordyce maintains the district court violated his right to due process and equal protection when it refused to apply the stand your ground law to his case.

First, we consider the State's argument that Fordyce has not preserved his equal protection argument because, while he raised it before the district court, the court did not rule on it. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). Fordyce responds that the district court ruled on the issue, pointing to the court's statement in the written ruling that not applying the amended law "will not result in any violation of the [Fordyce's] rights pursuant to the constitutions of the United States or the State of Iowa."

Here, we bypass the question whether Fordyce's equal protection argument has been preserved because we find it waived. In his appellate brief, Fordyce mentions in passing that failing to apply the amended law as his

---

[7] Fordyce contends we should consider his conduct after the shooting in reaching our determination. Fordyce's actions following the shooting—locking his gun in his vehicle, waiting for police to arrive, and then identifying himself as the shooter to authorities— certainly suggest Fordyce's subjective belief he was justified in his actions. But the legal determination of whether he was justified has both a subjective and objective component. *See State v. Frei*, 831 N.W.2d 70, 74 (Iowa 2013) ("The test of justification is both subjective and objective. The actor must actually believe that [another] is in danger and that belief must be a reasonable one."), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707–08 (Iowa 2016). Moreover, Fordyce's subjective belief about whether he was in danger is different than his subjective belief about whether he acted lawfully; there is no evidence Fordyce was aware of the state of the law at the time he shot Donald, and his "feeling" that he was justified is not determinative of a legal conclusion.

requests results in violation of his equal protection rights, but Fordyce cites no authority to support this position. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."). He undertakes no equal protection analysis. *See Soo Line R.R. Co.; v. Iowa Dep't of Transp.*, 521 N.W.2d 685, 691 (Iowa 1994) ("[Appellant's] random mention of this issue, without elaboration or supportive authority, is insufficient to raise the issue for our consideration."). He does not even assert that he is similarly situated to those defendants who invoke the stand your ground law after it became effective. *See Varnum v. Brien*, 763 N.W.2d 862, 882 (Iowa 2009) (recognizing the "threshold test" of the requirement of equal protection: "Under this threshold test, if plaintiffs cannot show as a preliminary matter that they are similarly situated, courts do not further consider whether their different treatment under a statute is permitted under the equal protection clause"). We do not consider this further.

Next, we consider whether due process requires the retroactive application of the stand your ground law.[8] First, we note that a "statute is presumed to be prospective in its operation unless expressly made

---

[8] Fordyce similarly fails to make a specific due process argument, but the State does not contest that the issue is properly before us for review. Additionally, the issue of due process is more innately involved with the issue of how to apply a change in law. *See, e.g.*, *State v. Harrison*, 914 N.W.2d 178, 192 (Iowa 2018):

> The Fifth and Fourteenth Amendments of the United States Constitution, and Article I, section 9 of the Iowa Constitution, prohibit the state from depriving any person of "life, liberty, or property, without due process of law." "'Due process requires fundamental fairness in a judicial proceeding,' so a trial that is fundamentally unfair violates the guarantees of due process in the United States and Iowa Constitutions." "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."

(Citations omitted.)

retrospective." Iowa Code § 4.5. Nothing in HF 517 provides for the statute to be applied retroactively. Additionally, "[i]t is well-settled law that substantive amendments to criminal statutes do not apply retroactively." *Harrison*, 914 N.W.2d at 205. As our supreme court has recognized before, due process under both the Iowa and Federal Constitutions "only require[] retroactive application of *clarifications* to existing substantive law, not *changes* to substantive law." *Nguyen v. State*, 878 N.W.2d 744, 754–56 (Iowa 2016). And our court has already determined that the stand your ground law is a substantive change in law. *See Hines v. State*, No. 17-2080, 2019 WL 1056030, at *1–2 (Iowa Ct. App. Mar. 9, 2019) (finding the "stand your ground" law is a change in substantive law and therefore does not apply retroactively); *State v. Barber*, No. 18-0038, 2019 WL 761631, at *9 (Iowa Ct. App. Feb. 20, 2019) ("The 2017 amendments to the justification defense at issue in this case were prospective, not retrospective, as the amendments were not expressly made retrospective and were substantive in nature."); *see also Roach v. State*, No. 18-0636, 2019 WL 1752666, at *1 (Iowa Ct. App. Apr. 17, 2019) (relying on prior rulings to determine stand your ground will not be applied retroactively). Our supreme court recently reached this same conclusion in *State v. Williams*, ___ N.W.2d ___, ___, 2019 WL 2236108, at *14 (Iowa 2019) (determining the "stand your ground" law is a substantive change in law, which does not apply retroactively (citing *Harrison*, 914 N.W.2d at 205)).

Fordyce argues stand your ground should be applied to his case even if it is not generally to be applied retroactively, maintaining it would not be a true retroactive application because his case was not finally decided at the time the law change took effect. The question is not the state of the law at the time the

court entered its decision but rather the state of the law at the time Fordyce shot and killed Donald. *See* Iowa Code § 4.13(1)(a) ("The reenactment, revision, amendment, or repeal of a statute does not affect any of the following: the prior operation of the statute or *any prior action* taken under the statute." (emphasis added)); *see also Harrison*, 914 N.W.2d at 205 (considering whether the law "exist[ed] in the Iowa Code at the time of [the defendant's] offense").

Finally, Fordyce maintains the rule of lenity requires the application of stand your ground to his case. The rule of lenity "directs that criminal statutes are to be strictly construed in favor of the accused." *State v. Hearn*, 797 N.W.2d 577, 585 (Iowa 2011).

> At a minimum, however, our cases stand for the proposition that the rule of lenity does not apply if there is no ambiguity regarding the application of a statute to a given set of facts after examination of the text, the context of the statute, and the evident statutory purpose as reflected in the express statutory language.

*Id.* at 587. After considering all of the above, we agree with the district court that the rule of lenity has no application here.

The district court did not err in refusing to apply the stand your ground law to Fordyce's case.

### C. Time between Trial and Verdict.

Fordyce maintains the amount of time that elapsed between the matter being submitted to the district court and the filing of the district court's ruling violated his right to due process.[9]

---

[9] In his appellate brief, Fordyce also contends the delay violated his right to speedy trial. Fordyce waived his right to speedy trial, so we do not consider this part of his claim.

The district court took approximately eleven months after the case was deemed submitted before it entered its verdict against Fordyce. We understand Fordyce's frustration with the delay. "We are far from unconcerned about delays in decision making in any court proceeding and have determined that a judicial decision ordinarily should be reached within sixty days after submission, even in the most complex matters." *State v. Kaster*, 469 N.W.2d 671, 673 (Iowa 1991). However, we have found no authority—and Fordyce has supplied none—that support a determination that a delay between trial and the district court's verdict violates a defendant's right to due process. In *Kaster*, our supreme court noted and expressed displeasure over the more than a year that elapsed between the trial and the entry of a verdict. 469 N.W.2d at 672. Still, the court "reject[ed] defendant's assertion he was denied a fair trial" based on the lengthy delay and refused to reverse the defendant's conviction or grant a mistrial. *Id.* at 672, 673.

Here, the court recognized the delay was a "lengthy amount of time" and "acknowledge[d]" it was "more time than [the court] would have ever wanted it to take" but ultimately explained the delay was a result of the court's wrestling with the application of the law to the facts—indicating the court took more time and care with the proceedings, not less. Additionally, Fordyce received credit against his sentence for the time he spent in jail before the verdict was entered. We acknowledge Fordyce's claim that, "due to the delay in rendering a verdict, the trial court felt compelled to convict Fordyce of something," but nothing in the record supports this assertion. Under these circumstances, we cannot say Fordyce's due process rights were violated.

**III. Conclusion.**

Because substantial evidence disproves Fordyce's justifications of self-defense and defense of others, the district court did not err in refusing to apply the stand your ground law to Fordyce's case, and we do not find Fordyce's due process rights were violated due to the delay between trial and the verdict, we affirm his conviction for voluntary manslaughter.

**AFFIRMED.**