# IN THE COURT OF APPEALS OF IOWA

No. 19-2007
Filed November 3, 2021

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**CHRISTOPHER DIXON,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Scott County, Henry W. Latham, II, Judge.

Christopher Dixon appeals his convictions for first-degree murder, first-degree robbery, and conspiracy to commit a forcible felony. **AFFIRMED**.

Jamie Hunter of Dickey, Campbell & Sahag Law Firm, PLC, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Heard by Mullins, P.J., and Schumacher and Ahlers, JJ.

**SCHUMACHER, Judge.**

Christopher Dixon appeals his convictions for first-degree murder, first-degree robbery, and conspiracy to commit a forcible felony. He alleges there is insufficient evidence to support any of his convictions. He also argues his sentence is unconstitutional because it violates his due process rights and is cruel and unusual. He further contends the court erred in ordering his sentences run consecutively, suggesting the robbery conviction should merge into his murder conviction. Finally, he argues the court abused its discretion during sentencing. We find there is sufficient evidence for the convictions, his sentence is not unconstitutional, his sentences regarding the first-degree murder and first-degree robbery do not merge, and the court did not abuse its discretion in sentencing. As a result, we affirm.

## I.    Background Facts & Proceedings

On the night of September 21, 2017, Tristan Alderman contacted Dixon, who had previously sold him marijuana. They planned to meet at a local grocery store parking lot. Alderman, Dixon, and Nikita Wiseman—Alderman's friend—met at the parking lot to talk, although the exact topic of the discussion is in dispute. Dixon claims it was to discuss a drug deal, although Wiseman testified he knew going into the meeting a robbery was planned for that night.

After leaving, Alderman and Dixon exchanged several text messages, including Alderman telling Dixon "I'm trusting you," Dixon responding "This shit fosho right," and, later, Alderman telling Dixon that he should not "be talking about numbers when we in the car it's between me and u that's knows." Dixon then

called Darell Williams, his step-son[1] and Dmarithe Culbreath, telling them that he had "something set up" and needed their help. Both Culbreath and Williams agreed to participate.

Later that night, Dixon drove his vehicle to pick up Alderman and Wiseman from Alderman's home. Culbreath and Williams followed in a separate car. Culbreath and Williams had never met or communicated with Alderman or Wiseman before that night. The two vehicles stopped a block or two away from Brady Tumlinson's home. Tumlinson and Alderman were life-long friends, although their relationship had become strained in recent weeks. Text messages and calls between Alderman and Tumlinson show Alderman frequently trying to communicate, with Tumlinson rarely replying. Tumlinson and his girlfriend were asleep when the two cars arrived.

Alderman, Wiseman, Williams, and Culbreath left the cars and approached Tumlinson's home. Dixon stayed close to the vehicles. Williams and Culbreath were armed with handguns, and everyone but Dixon was wearing black clothing. Some covered their faces with masks and bandanas. Gloves were handed out, although it is disputed if the gloves were handed out directly by the cars or once they started walking toward the Tumlinson home. The four men set up outside the house—Alderman pointed out Tumlinson's bedroom window. Either Alderman or Culbreath kicked in the door. After kicking in the door, shots were exchanged.

---

[1] Williams calls Dixon his step-dad because Dixon and William's mother share children and have been together for nearly his entire life, although they are not married.

Tumlinson died after being shot at least eight times.[2]  His girlfriend was shot six times, but survived.  Culbreath was shot during the exchange of gunfire and later went to the hospital for treatment.  The four men ran back to the cars.  Dixon drove Alderman and Wiseman away from the scene.

Police began their investigation the next morning.  Alderman inserted himself into the process early on, including pointing out a pair of bloody gloves two blocks away from the scene to the police.  He quickly became a person of interest. DNA swabs were taken from all five individuals involved.  The police obtained a search warrant and searched Dixon's home.  They also interrogated him for several hours.  As a result of the search and interrogation, Dixon was arrested for several drug offenses.[3]  After months of investigation, Alderman and Culbreath were charged with first-degree murder and convicted in December 2018.

Dixon was charged in April 2019 with several crimes connected to the murder.  He waived his right to a jury trial.  A bench trial took place August 26–29, 2019.  Over the course of the four-day trial, the court heard from seventeen witnesses, including co-defendants.  Williams and Wiseman both testified at Dixon's trial in exchange for plea deals.  The court admitted approximately two hundred exhibits, including documentation of DNA, ballistics, phone records, and location tracking.  The State contended Dixon was integral to the robbery-turned-murder: transporting the participants to and from the scene, as well as recruiting

---

[2] Testimony supports that Tumlinson was shot either eight or nine times.  It is unclear if he was hit twice with one bullet.

[3] Dixon admitted during the interview and conceded at trial that he sells marijuana.

Culbreath and Williams to participate. Dixon argued he was not involved in the murder.

The district court found Dixon guilty of murder in the first degree, in violation of Iowa Code sections 707.2(1)(b), 707.2(2), and 703.1 (2019). Specifically, the court found Dixon aided and abetted felony murder. The court also found Dixon guilty of first-degree robbery, based on his aiding and abetting the robbery and the "dangerous weapon alternative," in violation of Iowa Code sections 711.1(a), 711(2), and 703.1. Finally, the court found Dixon guilty of conspiracy to commit a forcible felony, in violation of Iowa Code section 706.3(1).[4] The court sentenced Dixon to life in prison without the possibility of parole for first-degree murder and twenty-five years in prison for robbery, to be served consecutively. The court ordered Dixon serve a mandatory minimum of seventy percent of the twenty-five-year sentence for robbery. Dixon appeals.

**II.    Analysis**

Dixon raises several arguments on appeal. First, he alleges there was insufficient evidence to convict him of first-degree murder, first-degree robbery, and conspiracy to commit a forcible felony. Second, he contends his sentence violates his due process rights and is cruel and unusual. Third, he claims his robbery conviction should merge with his conviction for murder. Finally, he asserts the district court abused its discretion when it sentenced him to serve at least seventy percent of the robbery sentence.

---

[4] The conspiracy conviction merged with the robbery conviction.

### A.     Sufficiency of Evidence

Dixon challenges the sufficiency of the evidence for his convictions for first-degree murder, first-degree robbery, and conspiracy to commit a forcible felony. In particular, he contends there is insufficient evidence he knew there would be a theft, there would be an assault, or there would be dangerous weapons involved.

We review sufficiency-of-the-evidence claims for correction of errors at law. *State v. Shorter*, 893 N.W.2d 65, 70 (Iowa 2017).  In making a determination on sufficiency of the evidence, we view the evidence in the light most favorable to the State, "regardless of whether it is contradicted, and every reasonable inference that may be deduced therefrom must be considered to supplement that evidence." *State v. Lilly*, 930 N.W.2d 293, 298 (Iowa 2019).  The evidence may be circumstantial or direct.  *Id.*  We will uphold the conviction if there is substantial evidence supporting it.  *State v. Henderson*, 908 N.W.2d 868, 875 (Iowa 2018). "Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt."  *Id.*  The same standards apply when, as here, the case is tried in a bench trial.  *State v. McFadden*, 320 N.W.2d 608, 614 (Iowa 1982).

Dixon's first-degree murder conviction was based on aiding and abetting felony murder, with his conviction for aiding and abetting robbery serving as the underlying felony offense.[5]  Iowa treats those who aid and abet the same as the principal committing the crime.  Iowa Code § 703.1.  Aiding and abetting is

---

[5] Iowa Code section 711.1 defines robbery as when a person, "having the intent to commit a theft," "commits an assault upon another" in order "to assist or further the commission of the intended theft."

established when there is substantial evidence "the accused assented to or lent countenance and approval to the criminal act by either actively participating or encouraging it prior to or at the time of its commission." *State v. Hearn*, 797 N.W.2d 577, 580 (Iowa 2011). "Knowledge [of the offense] is essential" to establish an aiding and abetting theory. *Id.* "When a defendant is accused of aiding and abetting . . . a crime in which intent is an element" the State must establish substantial evidence "that the defendant either participated with the intent himself or with the knowledge that the principal had the required intent." *State v Moss*, No. 08-1224, 2009 WL 3381053, at *4 (Iowa Ct. App. Oct. 21, 2009). "The element of intent is rarely capable of direct proof and may be shown by circumstantial evidence." *State v. Salkil*, 441 N.W.2d 386, 387 (Iowa Ct. App. 1989). Thus, to be convicted of aiding and abetting robbery and first-degree murder, the State needed to prove Dixon participated with the intent himself or knew the other participants intended to commit a robbery.

Dixon's first claim is there is insufficient evidence he knew the group planned to commit a theft, a necessary element of robbery. The record does not support his argument. There are several messages between Dixon and Alderman indicative of a plan to commit theft. After they met at the grocery store, Alderman texted Dixon "I'm trusting you." Later, Alderman texted Dixon again, telling him that he should not "be talking about numbers when we in the car it's between me and u that's knows." Along with other evidence, the messages fit the State's theory that Alderman was placing his trust in Dixon to set up the theft and they were hiding how they would divide the money from the others.

Moreover, the other conspirators' behavior signifies Dixon knew there would be a theft. For instance, Wiseman knew all along they were planning to steal money and drugs, and he wore black "because that's just what you wear" for such a plan. In fact, it appears all four of the other participants knew it would be a theft. Everyone wore black except for Dixon, who stayed behind near the cars.[6] Similarly, multiple parties wore masks or bandanas to cover their face. Gloves were passed out near the car where Dixon was parked. This behavior points to the inference that a theft would take place. While Dixon claims there was no time for him and Alderman to have planned the theft-turned-robbery, Wiseman testified that Dixon and Alderman stayed in the car after Wiseman got out following the meeting at the grocery store parking lot. That time provided enough of an opportunity to discuss the details of the theft that Alderman references when he told Dixon not to talk about the numbers when they were in the car. The record supports that Dixon knew the plan to commit a theft at the Tumlinson's house.

Dixon argues that even if he knew there would be a theft that night, there is no evidence he knew there would be an assault as well, thus making it a robbery. However, the record belies Dixon's argument. First, Dixon's calls to Williams supports the plan was to commit an assault during the theft. Williams testified to having committed at least one other robbery, which he was arrested for prior to the arrest for the robbery at issue. Moreover, he testified that, "usually when somebody tells [him] they got something set up," he went. Williams was also clear that he participated because he had just gotten out of prison and needed money

---

[6] Law enforcement testified that it is common for someone to stay behind to serve as lookout and getaway driver during thefts and robberies.

to support his family. Williams testified he and those he interacted with were usually armed. The record supports the conclusion that Dixon called Williams knowing Williams knew how to commit a robbery, showed up when called, and was in extra need of cash. It is reasonable to infer that Dixon knew they were armed because Williams, his stepson, said, "that's just what people do that we hang around." Calling him for a simple drug deal—what Dixon claims he thought was going on that night—is not supported on this record.

Dixon was the one who contacted and recruited Culbreath and Williams, the two members of the group that were armed. Again, everyone but Dixon, who did not approach the house, wore all black, gloves and at least some concealed their faces. Additionally, the group kicked in the door and shots were immediately fired. The immediacy of the gunfire also speaks to the intent of the parties. As Tumlinson's girlfriend testified: "They got into the corner of the room and pointed their gun at us and didn't say a word and just started firing." There is substantial evidence Dixon knew an assault would occur during the theft.[7]

Finally, Dixon suggests the evidence is more consistent with his version of events—that he thought this was merely a drug deal. However, the record contradicts this argument. One officer testified most drug deals happen very quickly, with as little contact and time spent between parties as possible. Here, Alderman and Dixon met several times and called or texted throughout the night.

---

[7] This also contradicts Dixon's contention that there is insufficient evidence he knew dangerous weapons would be used during the theft. Thus, for the same reasons as we find Dixon knew there would be an assault during the theft, we find there is sufficient evidence to establish the "dangerous weapon" alternative for robbery. See Iowa Code § 711.2.

Similarly, Dixon and the Williams/Culbreath duo drove across town, Dixon doing so repeatedly. This is inconsistent with a drug deal, which witnesses testified usually take place at the closest convenient location. Moreover, calling in Williams and Culbreath for a small drug deal conflicts with the witness testimony. The record does not support Dixon's version of events.[8]

There is ample evidence for a reasonable fact-finder to conclude Dixon knew there would be a robbery and actively participated in it. The record supports the court's finding that after communicating with Alderman—who had a falling out with the victim—Dixon contacted Culbreath and Williams and recruited them for the robbery. Culbreath and Williams had no known contact with Alderman and Wiseman up until they met that night—they would not have been involved but for Dixon. After that, Dixon picked up Alderman and Wiseman and drove close to the victim's home. Dixon served as lookout and later drove Alderman and Wiseman away as they fled the scene. Substantial evidence exists in this record that Dixon aided and abetted the robbery-turned-murder and conspired with the four other men to commit the robbery.

## B. Constitutionality of Sentence

Dixon argues his sentence for felony murder violates his due process rights under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, section 9 of the Iowa Constitution, by eliminating the intent elements usually necessary for a first-degree murder conviction. Dixon contends this

---

[8] For the reasons stated above, particularly Dixon's frequent communication with Alderman and his recruiting of Williams and Culbreath, we find sufficient evidence that Dixon agreed with the four other men to commit a robbery. Thus, the court did not err in finding Dixon guilty of conspiracy to commit a forcible felony.

amounts to establishing a mandatory presumption undermining the role of the fact-finder. He also argues his sentence is cruel and unusual in violation of the Eighth Amendment of the United States Constitution and article 1, section 17 of the Iowa Constitution. We review allegations of an unconstitutional sentence de novo. *State v. Harrison*, 914 N.W.2d 178, 187 (Iowa 2018).

Dixon concedes the issues of due process were not raised at trial. As such, Dixon failed to preserve the issue, and we do not address it. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). He seeks to circumvent our error preservation rules by arguing that the failure to raise the issue amounted to ineffective assistance of counsel, and asks us to adopt a plain-error rule. We cannot decide Dixon's ineffective-assistance-of-counsel claim on direct appeal. *See* Iowa Code § 814.7.[9] In addition, our supreme court has repeatedly rejected plain-error review. *State v. Treptow*, 960 N.W.2d 98, 109 (Iowa 2021). "We are not at liberty to overturn Iowa Supreme Court precedent." *State v. Grady*, No. 19-0865, 2020 WL 1049833, at *4 (Iowa Ct. App. Mar. 4, 2020). Therefore, we cannot consider the merits of Dixon's due process claim.

We can, however, consider Dixon's claim that the length of his sentence is cruel and unusual despite his failure to preserve the issue at trial. *State v. Bruegger*, 773 N.W.2d 862, 872 (Iowa 2009) ("Where, as here, the claim is that

---

[9] Dixon requests a plain-error rule because Iowa Code section 814.7 prohibits ineffective-assistance claims on direct appeal for sentences imposed after July 1, 2019. *State v. Damme*, 944 N.W.2d 98, 103 n.1 (Iowa 2020). Dixon was sentenced November 27, 2019, so section 814.7 prohibits consideration of his ineffective-assistance-of-counsel claim on direct appeal.

the sentence itself is inherently illegal, whether based on constitution or statute, we believe the claim may be brought at any time.").

Dixon claims his sentence is cruel and unusual as-applied because it is disproportionate to his involvement in the crime. A sentence is unconstitutional as-applied when it is "grossly disproportionate to [the defendant's] ultimate culpability." *Harrison*, 914 N.W.2d at 202. We use a three-prong test to decide whether the sentence is grossly disproportionate under both the Iowa and United States constitutions:

> First, we examine "whether the sentence being reviewed is 'grossly disproportionate' to the underlying crime," which "involves a balancing of the gravity of the crime against the severity of the sentence." This is the threshold question, and we do not inquire any further if the challenged sentence does not appear grossly disproportionate based on this balancing. If the threshold is met, we then engage in the second step of our analysis in which we partake in an intrajurisdictional analysis, comparing the challenged sentence to sentences of other crimes in our jurisdiction. Finally, we perform an interjurisdictional review, surveying the sentences for similar crimes in other jurisdictions.

*Harrison*, 914 N.W.2d at 203 (citations omitted).

When considering the first prong, "we owe substantial deference to the penalties the legislature has established" because "criminal punishment can have different goals, and choosing among them is within a legislature's discretion." *State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012). Generally, a repeat offender is more culpable than a first-time offender, thus deserving a longer sentence. *Id.* Additionally, "we analyze the facts of each case . . . because they 'can converge to generate a high risk of potential gross disproportionality." *Harrison*, 914 N.W.2d at 203 (citation omitted). Finally, "it is rare that a sentence will be so grossly

disproportionate to the crime as to satisfy the threshold inquiry and warrant further review." *Oliver*, 912 N.W.2d at 650.

Our supreme court has recently considered sentences for aiding and abetting felony murder with robbery as the underlying offense in light of a claim of cruel and unusual punishment. In *Harrison*, the court noted that felony murder "does not encompass 'acts of lesser culpability' since every felony murder requires a defendant's participation in a forcible felony that directly leads to the killing of the victim." 914 N.W.2d at 204. Similarly, "the legislature's decision to designate felony murder committed by either the principal or aider and abettor as first-degree murder reflects the seriousness of this offense." *Id.* Moreover, the actions of an aider and abettor "are exactly the type of actions the felony-murder rule is meant to encompass." *Id.* at 203-04.

Dixon brought two parties into contact to commit the robbery. He also drove some of those involved to and from the crime scene. He aided and abetted the robbery-turned-murder. *See Oliver*, 812 N.W.2d at 651 ("This is the type of [conduct] [the statute] was designed to prevent, not conduct that was inadvertently caught by a broadly worded statute."); *State v. Tribble*, 790 N.W.2d 121, 127 (Iowa 2010) ("The doctrine seeks to deter people from committing those felonies that present a heightened risk of death to others."); *Harrison*, 914 N.W.2d at 196 ("[A]rmed robbery [ ] requires the use of force and is 'so inherently dangerous' that participating in it as the principal or aider and abettor . . . carries with it an undeniable prospect of grave harm to the life of others."). Moreover, this is not a case of separate factors converging to greatly enhance the sentence. *Compare Harrison*, 914 N.W.2d at 204, *with Bruegger*, 773 N.W.2d at 884. While co-

conspirators who were arguably more culpable were sentenced to less time than Dixon, they also pled guilty to lesser charges in return for their testimony. We will not render one sentence unconstitutional just because others involved in the crime decided to plead while the defendant did not. Dixon's sentences are not cruel and unusual.

## C. Merger

Dixon argues his robbery conviction should have merged into his felony murder conviction as a lesser-included offense. "Review of an illegal sentence for lack of merger is for correction of errors at law." *State v. West*, 924 N.W.2d 502, 504 (Iowa 2019).

Iowa Code section 701.9 provides offenses should merge when one offense "is necessarily included in another public offense of which the person is convicted." When determining whether one offense is "necessarily included" in another, we use the so-called "impossibility test." *State v. Hickman*, 623 N.W.2d 847, 850 (Iowa 2001). "If the greater offense cannot be committed without also committing the lesser offense, the lesser is included in the greater." *Id.* Thus, if the elements of the greater offense include all the elements of the lesser offense, the lesser is merged into the greater offense.

Dixon recognizes that Iowa law "has long held . . . that 'the felony underlying a felony murder charge is not a lesser-included offense of felony murder.'" *State v. Ruesga*, 619 N.W.2d 377, 382 (Iowa 2000) (quoting *State v. Walters*, 426 N.W.2d 136, 141 (Iowa 1988)). In order to sustain a conviction for felony murder, "the State is not required to prove the defendant's *commission* of the underlying

felony but only his *participation* in it." *Id.* Thus, felony murder has elements distinct from the underlying felony, so it does not merge.

While agreeing with this legal framework, Dixon contends the district court found he had commissioned the underlying felony.[10] Thus, according to Dixon, the distinction between participation and commission does not apply, and the convictions should merge. However, the impossibility test is about the elements of the crime, not the court's findings. *See Hickman*, 623 N.W.2d at 850 ("[W]e look to the elements of each [offense]."). Therefore, the district court's findings have no bearing on merger analysis—we look only to whether the elements of the greater offense necessarily include the elements of the lesser offense.

Our supreme court has recently addressed the issue of merger in relation to robbery as the underlying offense for felony murder. In *Harrison*, the court found that "robbery is a distinct crime that necessitates the showing of a different intent from the killing," namely, the "intent to commit a theft." 914 N.W.2d at 208. Thus, unlike offenses that can be merged, such as assault, "felony robbery is not merely a less serious version of murder from which every felonious robbery ending in death could automatically be elevated to first-degree murder in the same way felonious assault could 'bootstrap the killing into first-degree murder.'" *Id.* (quoting *State v. Heemstra*, 721 N.W.2d 549, 557 (Iowa 2006)). Therefore, felony murder has elements distinct from robbery, particularly the requirements of intent. Consequently, the offenses do not merge, and the court did not err in ordering the sentences to run consecutively.

---

[10] The court did state, "Dixon and the other individuals *committed* the forcible felony of [r]obbery." (emphasis added).

### D.    Mandatory Minimum

Finally, Dixon contends the court abused its discretion by imposing a seventy percent mandatory minimum on his robbery conviction. We review a district court's sentence within its statutory limits for abuse of discretion. *State v. Guise*, 921 N.W.2d 26, 30 (Iowa 2018).

Dixon argues the district court was unaware it could impose a mandatory minimum of fifty percent under Iowa Code section 902.12(3). Additionally, he suggests the court failed to consider the factors set out in Iowa Code section 901.11(3), including "the person's criminal record, a validated risk assessment, and the negative impact the offense has had on the victim or other persons." Dixon takes particular issue with the district court's statement that "the Court has no discretion in [sentencing]. The only discretion the Court has is whether the sentences should run consecutive or concurrent to one another."

The district court demonstrated its understanding of its discretion to impose a lower mandatory minimum than seventy percent. First, both parties suggested at the sentencing hearing that seventy was the maximum allowed. For instance, the state argued for "the full 70 percent mandatory minimum" and "the 70 percent mandatory minimum is appropriate in this case based on [several factors]." Similarly, Dixon's attorneys asked the court to "consider the lower mandatory minimum" on the robbery conviction. Additionally, the court stated, "*it is appropriate* that the mandatory minimum of 70 percent be imposed." (Emphasis added). Therefore, the court understood it could impose something other than seventy percent for the mandatory minimum, but found that the circumstances of the case warranted imposition of the mandatory minimum.

Similarly, the record contradicts Dixon's argument that the court did not consider the factors set out in section 901.11. The court clearly states that the sentence was "imposed based on [Dixon's] criminal history and the nature and circumstances of this offense and pursuant to Iowa Code section 901.11." The court also conveyed it considered the seriousness of the offense, the impact on the community and victims, and the presentence investigation report. The record does not support Dixon's contention the court failed to consider the relevant factors when sentencing Dixon. We find no abuse of discretion by the trial court.

## III.    Conclusion

We find that there was sufficient evidence to convict Dixon of first-degree murder, first-degree robbery, and conspiracy to commit a forcible felony. We also find that his sentences were constitutional, the court did not err in ordering consecutive sentences because the offenses do not merge, and the court did not abuse its discretion in sentencing.

**AFFIRMED.**