# IN THE COURT OF APPEALS OF IOWA

No. 23-1910
Filed March 5, 2025

**RON JAREL MILLBROOK,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Scott County, Jeffrey Bert, Judge.

An applicant appeals the dismissal of his postconviction-relief application.

**AFFIRMED**.

William Monroe, Burlington, for appellant.

Brenna Bird, Attorney General, and Katherine Wenman, Assistant Attorney General, for appellee.

Considered by Greer, P.J., and Langholz and Sandy, JJ.

**GREER, Presiding Judge.**

During the evening of August 19, 2006, Ron Millbrook participated in a drive-by shooting, which resulted in the death of Vincelina Howard. Millbrook was charged with and convicted of first-degree murder and intimidation with a dangerous weapon with intent. After exhausting the direct appeal process, Millbrook applied for postconviction relief (PCR). His PCR application was denied, which Millbrook appeals. He claims his trial counsel[1] was ineffective for failing to impeach Vincent Harris, a witness Millbrook called, with his inconsistent testimony. On review, we find counsel's decision not to pursue impeachment on Millbrook's own witness was a reasonable tactical decision and did not amount to ineffective assistance of counsel. We affirm.

**I. Background Facts and Proceedings.**

Our supreme court previously described the facts of Millbrook's underlying criminal case as:

> On August 19, 2006, at approximately 10:30 p.m., a drive-by shooting in Davenport, Iowa, claimed the life of an innocent bystander, nineteen-year-old Vincelina Howard. Howard, along with twenty to thirty other persons, was attending an outdoor party at her grandmother's house when a minivan, driving by slowly, opened fire on the partygoers. Howard received a fatal wound to her neck and died a short time later at a nearby hospital. The defendant subsequently confessed that he was one of the occupants of the van and had participated in the shooting.
> . . . .
> At some point during the drive, a decision was made to go to the Iowa side of the river and look for Stevie West and another man. It was believed these two persons had been involved in a shooting at a Rock Island club the evening before. As Millbrook and his friends crossed the bridge into Davenport, they spotted West traveling in a vehicle ahead of them. They followed West's vehicle to the vicinity of a Super America gas station next door to the Howard

---

[1] At the time of the PCR hearing, Millbrook's trial counsel was deceased.

house. Driving by the residence, they noticed the party going on in the yard.

[The van's driver] circled around the block and drove slowly down the alley adjacent to the Howard residence. As they proceeded down the alley, White shouted, "There they go." At White's urging, Millbrook then opened the minivan's sliding door, and all four of the men in the van began firing their guns out of the passenger side of the vehicle in the direction of the partygoers. Millbrook's gun was fully loaded with seven rounds of ammunition. He fired the weapon until it was empty. . . .

. . . .

At the scene of the shooting, partygoers had gotten down on the ground when the shooting began. Witnesses testified there were a lot of shots, a short break in the shooting, and then some more shots. When the shooting stopped, partygoers realized Howard had been shot and was unresponsive. Efforts to revive her were unsuccessful, and she died at the hospital a short time later.

. . . .

Only two bullets were found in the Howard yard itself; both had been fired from Millbrook's gun. One of these bullets was found in a pool of the victim's blood.

*State v. Millbrook*, 788 N.W.2d 647, 648–50 (Iowa 2010). Millbrook was charged with two criminal counts—murder in the first degree (count I) and intimidation with a dangerous weapon with intent (count II). A jury convicted Millbrook on both counts. Millbrook was sentenced to life in prison without the possibility of parole on count I and ten years imprisonment on count II, to be served consecutively. Millbrook appealed his convictions to this court, we affirmed his convictions. *See State v. Millbrook,* No. 07-0309, 2008 WL 4530701, at *4–5 (Iowa Ct. App. Oct. 1, 2008) (preserving Millbrook's claims of ineffective assistance of counsel for PCR proceedings). Our supreme court took Millbrook's appeal on further review and affirmed his felony-murder conviction. *Millbrook,* 788 N.W.2d 647, 650–54 (limiting his appeal to issues involving the felony-murder conviction). Procedendo issued on October 12, 2010.

Having exhausted his direct appeal, Millbrook filed his first application for PCR pro se on February 18, 2011. After three successive amendments to his original application, Millbrook presented six arguments during his October 9, 2023 PCR hearing. The district court denied all six claims—five ineffective-assistance-of-counsel arguments and one claim the district court erred in denying his motion for mistrial. Millbrook appeals, narrowing his issues to just one of his PCR challenges.

## II. Standard of Review.

"Generally, an appeal from a denial of an application for [PCR] is reviewed for correction of errors at law." *Perez v. State*, 816 N.W.2d 354, 356 (Iowa 2012) (citation omitted). "Claims of ineffective assistance of counsel implicate the constitutional right to counsel; therefore, we review the claim de novo." *State v. Lopez*, 907 N.W.2d 112, 116 (Iowa 2018).

## III. Discussion.

In describing the circumstances of the underlying shooting, Millbrook contended that Vincent Harris, the father of the decedent, told Davenport Officer Andy Neyrinck that Vincelina's death was caused by the shooters from a second vehicle, not the first vehicle, which was the van that Millbrook was in that also shot at the group of partygoers. Noting the sequence was important, Millbrook asserts his trial counsel was ineffective for failing to impeach Harris on that point during the direct examination. At trial, Harris testified that individuals in a second vehicle fired towards him and Vincelina, along with the larger social gathering, mere seconds after the first vehicle. This testimony was favorable to Millbrook, as Harris was an eyewitness to the crime and Millbrook was not affiliated with the second

car. Millbrook argues that discrediting Harris's testimony through impeachment would have cast doubt on the whole of Harris's testimony. But, here, we note that net to cast doubt would have caught portions of Harris's testimony that may have been beneficial to Millbrook's theory of the case.

"To prevail on an ineffective-assistance-of-counsel claim, the [applicant] must prove the following elements:(1) trial counsel failed to perform an essential duty, and (2) prejudice resulted from counsel's failure." *State v. Dudley*, 766 N.W.2d 606, 620 (Iowa 2009). It is Millbrook's burden to prove both elements; if he fails to prove one element, we need not address the remainder. *See State v. Harrison*, 914 N.W.2d 178, 206 (Iowa 2018).

Addressing this challenge, the district court found (1) it was a tactical decision not to impeach Harris and (2) trial counsel "got into the record" the information he wanted addressed in ways other than impeachment by reading Harris's deposition testimony. The district court noted that Millbrook agreed at the PCR hearing that his counsel used the evidence in closing argument to show "how important the deposition testimony of Mr. Harris was and why it should have led to a verdict of not guilty." As Millbrook testified during direct examination at the PCR hearing:

> Q. And did your [trial] attorney fail to impeach [Harris] on that or bring that testimony out in any way? A. No. He brought it up during trial. [Trial counsel] brought it up during trial. He asked him if he recalled his deposition, and I believe he did not recall his deposition, so [trial counsel] pulled his deposition out and asked him did he recall the words that were—that was written in the deposition, and he said, "If that's what I said, then that's what I said."

And, on our review, we note Harris's deposition testimony was not wholly beneficial to Millbrook. During his deposition, Harris answered:

Q. At the time, were you able to tell whether or not your daughter was okay?  A. The first time?

Q. The first time, after the first—the van passed.  A. Not really.  When the first one came through, everybody stood up and we were asking everybody.  And by the time we looked, there was a body still laying down, but we didn't know if she was shot then.  You didn't have time to really react to her because the second one comes and everybody's back down.

Q. Okay.  Nobody was able to speak to Vincelina or say, Hey are you okay?  Did she speak with anybody, do you recall—  A. No.

Q. —after the first van?  A. Like I said, I was the one who pulled her down.  I was right beside her.  No, no one got to talk to her.  I don't know if she was hit the first time or the second time.

Harris stated he "pulled her down" after the first cluster of gunshots, but he also swore under oath he did not know if his daughter "was hit the first or second time," referring to the clusters of gunshots.  With these seemingly conflicting statements on direct examination, Millbrook's counsel's decision to tread lightly in his treatment of Harris was not an unreasonable trial decision.  Any benefit Millbrook would receive from impeaching Harris on pulling the victim down between bursts of gunfire would almost assuredly be diluted by other deposition statements, including statements from Harris like, "I don't know if she was hit the first time or the second time," and "we didn't know if she was shot then," referring to the first set of gunshots.  And at trial, Harris distinguished his previous statements, declining to testify that he "pulled her down":

Q. Okay.  After you tried to get up after the first series of shots, did you see Vincelina?  A. Not really.  I couldn't say I did because at the time as we was trying to get up, we was trying to see which way the shooting was coming from.

Q. Okay.  Did you see her also trying to get up at the time?  A. I really couldn't say if I did at that time, not—like I said, it was just a brief moment and we was right back down.

Q. All right.  Do you recall her moving at any time between the two series of shots?  A. Between the shooting?

Q. Between the two series of shots that you heard. A. No, sir. Like I said, we was trying to see where the shooting was coming from.

Instead of aggressively impeaching the father of the deceased with his inconsistent statements, which from trial counsel's vantage point might have angered the jury, trial counsel got the information before the jury and argued in closing:

> In between those two vehicles, there are his observations of his daughter, the victim in this case, Vincelina Howard. Remember, Harris stated that he was near his daughter at the time of this incident, and Harris stated who was around at the time of this incident in this general area . . . .
> Harris's back was to the street, to 12th Street, and his recollection was, as Detective Neyrinck reported it, of seeing Vincelina also get up, his recollection of trying to grab Vincelina and grabbing her by the ankle so he could pull her down as the second series of shots rang out. So, is that important? Yes, it is important. . . . You don't know where they were in relation to the van, and there is no connection between Mr. Millbrook and a second vehicle. The cops hadn't placed anybody in a second vehicle. You don't have any connection or any information or evidence that suggests Mr. Millbrook is associated with a second car, and that's important.

Thus the decision to forego impeachment was a tactical one, well within the limits of appropriate counsel conduct and not below the normal range of competency. *See Sothman v. State*, 967 N.W.2d 512, 522 (Iowa 2021). "Crafting a trial strategy is inherently difficult, so we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [applicant] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Harrison*, 914 N.W.2d at 206 (cleaned up). "[C]laims of ineffective assistance involving tactical or strategic decisions of counsel must be examined in light of all the circumstances

to ascertain whether the actions were a product of tactics or inattention to the responsibilities of an attorney guaranteed a defendant under the Sixth Amendment." *Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001). "'Improvident trial strategy or miscalculated tactics' typically do not constitute ineffective assistance of counsel." *State v. Polly*, 657 N.W.2d 462, 468 (Iowa 2003) (citation omitted).

Following our review, we conclude Millbrook did not meet his burden to show trial counsel violated an essential duty by declining to impeach Millbrook's witness during direct examination. Because Millbrook failed to show a breach of an essential duty, his claim fails. *See Harrison*, 914 N.W.2d at 206 (recognizing the analysis ends if the applicants fails on either prong).

## IV. Conclusion.

We affirm the denial of Millbrook's PCR application.

**AFFIRMED.**